[Civil No. 3753.   Filed February 1, 1937.]

[64 Pac. (2d) 819.]

COLUMBUS P. GIRAGI and GEORGE A. GIRAGI, Copartners, Doing Business Under the Firm Name and Style of "GIRAGI BROTHERS, PUBLISHERS," and SOUTHSIDE PUBLISHING COMPANY, a Corporation, Appellants, v. THAD M. MOORE, FRANK LUKE and D. C. O'NEIL, as Members of and Constituting the State Tax Commission of Arizona, Appellees.

Messrs. Armstrong, Kramer, Morrison & Roche and Messrs. Sutter & Gentry, for Appellants.

Mr. John L. Sullivan, Attorney General, and Mr. A. I. Winsett, Assistant Attorney General, for Appellees.

Messrs. Mathews & Bilby, Messrs. Darnell, Pattee & Robertson, Messrs. Ellinwood & Ross, and Messrs. Kibbey, Bennett, Gust, Smith & Rosenfeld, *Amici Curiae.*

ROSS, J.—After our opinion holding chapter 77, Laws of 1935, commonly referred to as ''The Excise Revenue Act of 1935,'' imposed a privilege tax of 1 per cent. on the gross income of newspapers (48 Ariz. 33, 58 Pac. (2d) 1249) a motion for rehearing was filed raising for the first time the constitutionality of the act on the ground that it deprived appellants of due process of law, in contravention of the Fourteenth Amendment to the Constitution of the United States. This contention, it is asserted, finds support in the decision of the Supreme Court of the United States in *Grosjean* v. *American Press Co.,* 297 U. S. 233, 56 Sup. Ct. 444, 448, 80 L. Ed. 660, decided February 10, 1936, holding a Louisiana statute, which imposed a sales tax on the gross income of all newspapers with a weekly circula-

tion of more than 20,000, violated the due process clause of such amendment.

At the time the Grosjean case was decided, because of the "history and . . . setting" of the Louisiana law, it was given very wide and general publicity but, because of the great dissimilarity of the facts and circumstances, it did not occur to us that the decision was in point and we did not discuss or consider it. Counsel did not cite it. Now, however, they insist that it rules this case.

The *amici curiae* identify themselves with newspaper clients and are in agreement with the appellants on the invalidity of the law. It is what the court said in the Grosjean case upon which they rely, and the argument of the *amici curiae* is entirely confined to an analysis of that case in an effort to show its applicability to the facts of this case. In addition to such contention, the appellants reargue the law upon which the case was decided, with a view of trying to convince us that we should change our ruling, but we are satisfied that our construction of chapter 77, *supra,* is correct. Since the decision we shall render hinges upon the Grosjean case, we will first give our analysis of the law as declared by the court in that case.

Under the facts and circumstances of that case, a 2 per cent. sales tax on the gross income of a certain segment of the newspapers published in Louisiana was held to abridge the freedom of the press, in contravention of the due process clause of the Fourteenth Amendment to the federal Constitution. If chapter 77, *supra,* is within the reason of the rule announced, we should change our opinion to conform therewith, for the decisions by the Supreme Court as to what the law is in construing the federal Constitution are binding upon us. We do not think the decision in that case, directly or by implication, goes as far as contended. In the first place, the court placed the Louisiana act

side by side with legislation "hostile" to the press, naming as such the early English and Massachusetts statutes imposing stamp, paper, and advertising taxes upon the popular press for the purpose of restraining or curbing it. "These duties," the court said, "were quite commonly characterized as 'taxes on knowledge,' a phrase used for the purpose of describing the effect of the exactions and at the same time condemning them." Following a short review of the history of the "taxes on knowledge" the court said:

"Citations of similar import might be multiplied many times; but the foregoing is enough to demonstrate beyond peradventure that in the adoption of the English newspaper stamp tax and the tax on advertisements, revenue was of subordinate concern; and that the dominant and controlling aim was to prevent, or curtail the opportunity for, the acquisition of knowledge by the people in respect of their governmental affairs."

The court deduces that it was this kind of legislation against a free press that caused the adoption of the First Amendment to the Constitution forbidding Congress to make any law abridging the freedom of speech and of the press, and the Fourteenth Amendment forbidding any of the states to make or enforce any law depriving any person of life, liberty, or property without due process of law, and said by these provisions the national government and the states were precluded "from adopting any form of previous restraint upon printed publications, or their circulation, including that which had theretofore been affected by these two well-known and odious methods"; that is, stamp tax and tax on advertisements. The phrase "any form of previous restraint" is very comprehensive. It is not limited to the odious forms mentioned. These it certainly includes. "But," the court concludes, using Judge COOLEY'S language, it in-

cludes "any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens." 2 Cooley, Const. Lim., 8th ed., p. 886. After observing that the press is a vital force to keep the people informed as to the actions of their government, and the wisdom and necessity of its being kept free and untrammeled in the performance of its function of publicity, the court condemned the Louisiana tax law, in very strong and cogent language, as follows:

"The tax here involved is bad not because it takes money from the pockets of the appellees. If that were all, a wholly different question would be presented. It is bad because, in the light of its history and of its present setting, it is seen to be a deliberate and calculated device in the guise of a tax to limit the circulation of information to which the public is entitled in virtue of the constitutional guaranties. . . .

"In view of the persistent search for new subjects of taxation, it is not without significance that, with the single exception of the Louisiana statute, so far as we can discover, no state during the one hundred fifty years of our national existence has undertaken to impose a tax like that now in question.

"The form in which the tax is imposed is in itself suspicious. It is not measured or limited by the volume of advertisements. It is measured alone by the extent of the circulation of the publication in which the advertisements are carried, with the plain purpose of penalizing the publishers and curtailing the circulation of a selected group of newspapers."

Thus it is (1) "a deliberate and calculated device" to limit the circulation of newspapers, and (2) there is nothing like it in any state in the 150 years of our national existence, and (3) the tax is not measured or limited by the amount of the gross income but by circulation *"with the plain purpose of penalizing the pub-*

*lishers and curtailing the circulation of a selected group of newspapers.''* We think it is apparent on the face of the opinion that the reason the court chose to place the unconstitutionality of the Louisiana law upon its contravention of the due process clause, and not upon its unnatural and unreasonable classification and consequent discrimination as was done in the lower court ([D. C.] 10 Fed. Supp. 161), is that it felt that *no classification* that has for its purpose the penalizing of the press and the curtailing of its circulation among the people will be regarded as due process, and thereby once for all foreclosed any efforts of that kind in Louisiana or elsewhere.

We will now turn to chapter 77, *supra,* and see how different it is in origin, purpose, and effect. It was not dictated by a dominant political ruler to limit the circulation or penalize newspapers that criticized and opposed his policies, but was the result of the calm and considered judgment of the members of the legislature of the state. Its controlling purpose was to raise revenue to help defray the current expenses of state government and state obligations and contribute to the relief of the needy and unemployed during the depression period. No hostility is shown the press, nor is any purpose or design to restrain the press apparent.

Chapter 77, *supra,* is a general sales tax law. It levies and directs the State Tax Commission to collect a tax upon the sales or gross income of practically every person or concern engaged in selling merchandise or services in the state. Section 2, article 2.

Section 11, Id., provides that every person engaging or continuing in a business required to pay the tax shall apply for and obtain a license from the Tax Commission, pay $1 therefor and display it in his place of business; provides that parties failing to procure such license or display it shall be punished by a fine

of not less than $10 or by imprisonment for ten days or both.

Section 12, Id., makes it the duty of the assessors of the several counties to report, within thirty days after the act takes effect, the names and addresses of all persons subject to the tax in their respective counties and annually thereafter before March 15th; also to report quarterly every person who has commenced a business within the three preceding months.

Section 13, Id., provides that the tax shall be paid monthly and if not paid within five days after due the taxpayer is subject to a 25 per cent. penalty.

Section 23, Id., makes it a misdemeanor for any person to fail or refuse to make return of his sales, or to make a false and fraudulent return, or to evade, or aid or abet others to evade, the payment of the tax, and subjects such person to a fine of $25 for each offense.

Section 18, Id., makes the tax a personal debt and provides that the Tax Commission shall issue its warrant to the sheriff of the county, commanding him to levy upon and sell the real and personal property of the taxpayer failing or refusing to pay his taxes.

Section 27, Id., authorizes an injunction against any person engaging or continuing in any of the businesses for which a privilege tax is required until the taxes levied have been paid and such person has complied with the law.

First, it is said that the requirement that persons obtain a license before engaging or continuing in a business subject to the tax is a previous restraint on such business, in this case on the business of publishing a newspaper. No condition except payment of a license fee is attached to the issuance of the license. All persons who pay the fee are entitled to receive a license and for whatever location it may be applied for. The amount of the fee is fixed and unvarying

and is paid but once. The $1 is nothing more than a registration tax. It is the means of keeping the Tax Commission informed as to who are taxable and where their places of business are so that the commission may supply them with blank forms, and, too, it keeps those in the business alive to the necessity of keeping books and making monthly reports. It is said that,

"where the fee is exacted solely or primarily for revenue purposes and payment of the fee gives the right to carry on the business or occupation without the performance of any further conditions, it is not a license fee but a tax imposed under the power of taxation, regardless of the name by which it may be called." 37 C. J. 170, § 6.

After this $1 license fee or tax is paid, the Tax Commission has no control over the business of the licensee. Its exaction is in no sense regulatory and in the exercise of the police power.

■ And the making it a misdemeanor not to pay the license fee does not affect its character as a tax. In *State* v. *Murphy,* 90 Conn. 662, 98 Atl. 343, 344, it is said:

"It does not militate against the taxation character of the act, that it is in form one which provides for the issuance of a license and the payment of a license fee as conditions of the doing of an act in the enjoyment of property rights, and makes the violation of its provisions a misdemeanor. License Tax Cases, 72 U. S. (5 Wall.) 462, 471, 472, 18 L. Ed. 497; *State* v. *Feingold,* 77 Conn. 326, 328, 59 Atl. 211; *State* v. *Conlon,* 65 Conn. 478, 482 [483], 33 Atl. 519, 31 L. R. A. 55, 48 Am. St. Rep. 227."

Second, it is contended that the imposition of "an amount equal to 1% of the gross proceeds received from the publication . . . " is a previous restraint upon the business of publishing a newspaper and violative of the due process clause. This contention is predicated on the idea, if we understand it correctly,

that such a tax being upon the occupation or privilege of doing business is not one ''of the ordinary forms of taxation for support of the government.'' In the Grosjean case the court was particularly careful to point out that the rule stated therein as to the taxation of newspapers was not of universal application. The court said:

''It is not intended by anything we have said to suggest that the owners of newspapers are immune from any of the ordinary forms of taxation for support of the government. But this is not an ordinary form of tax, but one single in kind, with a long history of hostile misuse against the freedom of the press.''

Counsel suggest that a tax on the gross sales or income of a business is not an ''ordinary form of taxation'' and is therefore invalid under the Grosjean decision. It will be noted that the court described the tax in the Grosjean case as ''one single in kind.'' In other words, it was unique and ''with the *single* exception of the Louisiana statute . . . no state during the one hundred fifty years of our national existence has undertaken to impose a tax like that now in question.'' (Italics ours.) What the court said, and what it meant to say evidently, was that the tax there being discussed was not one of the ordinary forms of taxation but extraordinary. The tax is ''single in kind'' and extraordinary, not only in the respects mentioned by the court, but because the newspapers paying it cannot pass it on to the ultimate consumer without losing him to competing newspapers not paying the tax. It is a cleverly devised scheme under the guise of taxation to punish enemies and reward friends. In *Commonwealth* v. *Boston Transcript Co.,* 249 Mass. 477, 144 N. E. 400, 402, 35 A. L. R. 1, 6, it is said:

''They [newspaper publishers] have no special immunities. They do not constitute a privileged class.

They are entitled to invoke constitutional guaranties in common with others.''

The rule contended for would certainly place the publishers of newspapers in a favored class. It would permit the taxing of all other businesses upon their sales or gross income and exempt newspapers and other publications. The Supreme Court would have to say in the plainest and most unequivocal language that the burden of taxation should not be borne by the press and all others taxed before we would believe that court intended such a rule. Certainly it has not so stated in the Grosjean case.

█ It is obvious the tax will reduce to its extent the net income of all persons required to pay it, including newspaper publishers. Every business taxed faces the same problem. If security of life and property were possible without expense, taxes could be forgotten, but, since that is not possible, all who share the protection given by the government should also share the expense of that protection in proportion to their ability, regardless of the business they are engaged in, if it is for profit. The mere fact that a tax reduces a person's net income is no legal restraint on him or his business. If the taxpayer is a newspaper publisher, it must appear that the law not only ''takes money from the pockets,'' but also that the law was adopted by the state as a ''form of previous restraint upon printed publications, or their circulation.'' If it is so adopted, then, however small the tax may be, it is bad and in violation of due process. It is not the amount of the tax, but the use of it as a means to abridge the freedom of the press, that is forbidden. The adoption of chapter 77, *supra,* was for the sole purpose of raising revenue and is, therefore, not within the spirit of the prohibition of the Fourteenth Amendment against depriving one of the fundamental right of due process.

■ Third, it is contended that chapter 77, *supra,* in authorizing an action to restrain and enjoin a newspaper publisher until the taxes are paid and he has complied with all its provisions, invalidates the act.

This feature of the act is not before us. There is no allegation in the complaint that the commission or the Attorney General threatens or intends to invoke injunctive relief, the only allegation being that the Tax Commission threatens to enforce the payment of the tax by its warrant to the sheriff commanding him to levy upon and sell appellants' property. Until the right of the state to enjoin one liable for the tax from engaging or continuing in his business for failure to pay tax and comply with the act is involved, we prefer not to pass upon the question.

■ It may be rejected without impairing other parts of the law. The method of collecting the tax by the Tax Commission's warrant would be unaffected by its elimination. Section 4, article 3, of the act says:

"If any article, section, subdivision, phrase or sentence of this act shall be declared unconstitutional, it shall not affect the constitutionality or validity of the remainder of the act."

We are of the opinion that chapter 77, *supra,* is constitutional and that the tax is valid.

McALISTER, C. J., concurs.

LOCKWOOD, J. (Specially Concurring).—I concur in the conclusion reached by the majority of the court and in the very lucid and logical reasoning followed by Mr. Justice ROSS in reaching the conclusion. I desire, however, to elaborate somewhat on one or two of the points discussed by him.

Counsel for appellant based their motion for rehearing solely on the contention that the statute vio-

lates the due process clause of the Fourteenth Amendment to the federal Constitution, and limited their argument in support of such contention almost entirely to the meaning of the opinion of the Supreme Court of the United States in the Grosjean case, *supra*. There is, of course, no doubt that if our statute violates any of the principles laid down therein it is invalid, for the decision of the court which determined that famous case is binding on every state court when the meaning and effect of the federal Constitution are involved. It is necessary, therefore, that we ascertain just what was really decided in the case referred to.

In determining the general principles of law which are to be deduced from the language used by any court in rendering judgment in a particular case, it is frequently necessary to consider, not only the specific facts on which the particular judgment is legally based, but the general background of the case. This is especially true when that background is of such an extraordinary nature that it materially affects an understanding of the true meaning of the court.

It is a notorious fact that at the time the Grosjean case was decided, a situation existed in the state of Louisiana which was unparalleled in American history. A single individual had obtained a control over the entire executive, legislative, and judicial machinery of that state as absolute as that exercised by any modern European dictatorship. Whether such control met with the real approval of the majority of the citizens of Louisiana or not was immaterial so far as the issues of the Grosjean case were concerned. There was, however, a minority at least in that state, who were bitterly opposed to that dictatorship, and who were endeavoring to call the attention of the citizens to the situation, and urging a return to what they believed to be the spirit as well as the form of democ-

racy. The only practical means which they had of presenting their cause to the people was through the press. The great majority of the larger newspapers of the state were opposed to the existing political set-up, while many, if not most, of the smaller periodicals took an opposite attitude. With this background, the statute involved in the Grosjean case was adopted. It imposed on all newspapers published in the state with a circulation of over 20,000 what was called a license tax for the privilege of doing business, and which amounted to 2 per cent. of the gross income of such papers, leaving untaxed all newspapers with a lesser circulation. The statute was attacked in the federal courts as violating the due process clause of the Fourteenth Amendment. The lower court held it unconstitutional, as being an arbitrary and unjust classification, and the case was brought to the court of last resort. That court did not consider the question of classification, but based its decision on the ground that it abridged the freedom of the press.

It was argued by counsel for appellant that, in effect, the language of the court can only be taken as meaning that no tax which is in form one for the privilege of engaging in business can be imposed on periodicals engaged in the dissemination of public information. On a casual reading of the opinion this conclusion might well be reached, but a more careful analysis convinces me that such is not the case, and that the true meaning of the court may be stated as follows:

''We have no intention of limiting the power of the states to impose any reasonable method of taxation for the purpose of revenue, general in its application, upon newspapers as well as upon all other businesses and occupations, but whenever a law is adopted which affects the press it will be most carefully scrutinized by the courts, and no matter what its *form*, if its true purpose and probable effect is to impose a *previous*

*restraint* on the dissemination of information, it will be held void.''

I think the following quotations from the opinion show this clearly:

''This court had occasion in *Near* v. *Minnesota, supra,* 283 U. S. 697, at pages 713 et seq., 51 Sup. Ct. 625, 75 L. Ed. 1357, 1366, to discuss at some length the subject in its general aspect. The conclusion there stated is that the object of the constitutional provisions was to prevent previous restraints on publication; and the court was careful not to limit the protection of the right to any particular way of abridging it. Liberty of the press within the meaning of the constitutional provision, it was broadly said (283 U. S. 697, at page 716, 51 Sup. Ct. 625, 631, 75 L. Ed. 1357), meant 'principally although not exclusively, immunity from previous restraints or (from) censorship.'

''Judge COOLEY has laid down the test to be applied: 'The evils to be prevented were not the censorship of the press merely, but any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens.' 2 Cooley's Constitutional Limitations, 8th ed., p. 886.

''It is not intended by anything we have said to suggest that the owners of newspapers are immune from any of the ordinary forms of taxation for support of the government. But this is not an ordinary form of tax, but one single in kind, with a long history of hostile misuse against the freedom of the press. . . .

''The tax here involved is bad not because it takes money from the pockets of the appellees. If that were all, a wholly different question would be presented. It is bad because, *in the light of its history and of its present setting,* it is seen to be a deliberate and calculated device in the guise of a tax to limit the circulation of information to which the public is entitled in virtue of the constitutional guaranties.'' (Italics ours.)

A careful consideration of the Arizona statute ''in the light of its history and of its present setting'' will

convince any unprejudiced observer that it in no manner violates any of the principles so truly set forth in the Grosjean case, except that perhaps it might possibly be claimed the injunctive feature of the act has that effect. But this section is not involved in the present case, is separable from the balance of the act, and can and will, by the express language of section 4 of article 3, be stricken without affecting the remainder of the act, if necessary.