**MINNEAPOLIS STAR AND TRIBUNE COMPANY, Respondent,**

v.

**COMMISSIONER OF REVENUE, Appellant.**

No. 51616.

Supreme Court of Minnesota.

Dec. 17, 1981.

Warren Spannaus, Atty. Gen., and Paul R. Kempainen, Sp. Asst. Atty. Gen., Dept. of Revenue, St. Paul, for appellant.

Faegre & Benson, Lawrence C. Brown, John K. Steffen and John P. Borger, Minneapolis, for respondent.

Robert G. Danielsen, MCLU Volunteer Atty., St. Paul, Linda Ojala, MCLU Legal Counsel, Minneapolis, for amicus curiae.

SHERAN, Chief Justice.

The issue in this case is whether the State of Minnesota may, consistent with both the federal and state constitutions, impose a use tax on consumption of ink and paper which, due to an exemption in the law, is paid by some newspapers and publications but not by all. The challenged statute in force at the times relevant here, Minn.Stat. § 297A.14 (1980), provided that "the cost of paper and ink products exceeding $100,000 in any calendar year, used or consumed in producing a publication defined in section 297A.25, subdivision 1, clause (i)" was subject to the general use tax imposed by the section: a tax on "using, storing or consuming in Minnesota tangible personal property" at a rate of 4% of the sales price of sales at retail of the item.[1] Section 297A.25, subd. 1(i), states that a "publication" is a legal newspaper, defined by Minn.Stat. § 331.02 (1980), or any other publication "regularly issued at average intervals not exceeding three months." Respondent, a newspaper publisher consuming over $100,-000 in paper and ink products annually, challenges the use tax as an unconstitutional burden upon freedom of the press, protected by U.S.Const. amend. I, XIV, and Minn.Const. art. 1, § 3, and a denial of equal protection of the law, provided by U.S.Const. amend. XIV, § 1, and Minn. Const. art. 10, § 1.

Respondent Minneapolis Star and Tribune Company (Star Tribune) sought a refund from the state department of revenue of $874,265.04, with interest, in use taxes paid over a 17-month period from January 1, 1974, to May 31, 1975. The refund was denied and respondent appealed the denial in Hennepin County District Court pursuant to Minn.Stat. § 297A.35, subd. 2 (1980).

1. The rate of this use tax has now been raised to 5% for the period after June 30, 1981, and prior to July 1, 1983. Act of June 6, 1981, ch. 1, art. IV, § 5, 1981 Minn.Sp.Sess.Law Serv. (West). The $100,000 figure and relevant wording of section 297A.14 have not been altered. *Id.*

The district court granted summary judgment to Star Tribune, declaring the use tax unconstitutional on all suggested grounds. We reverse.

## I.

The use tax challenged here is part of a system of sales and use taxes initially created by the state legislature in the Tax Reform and Relief Act of 1967. Act of June 1, 1967, ch. 32, art. 13, 1967 Minn.Laws Sp.Sess. 2143, 2177. The law then wholly exempted from use tax the gross receipts from the sale, storage, use or consumption of all tangible personal property, including paper and ink products, used in or consumed in any publication regularly issued at average intervals not exceeding three months. *Id.* § 25, subd. 1(i), at 2186. The publications themselves were also exempt from sales tax. *Id.* The rate of sales and use tax was 3% at that time. *Id.* § 2, at 2179; § 14, at 2182.

Effective November 1, 1971, the paper and ink products exemption for publications was eliminated and all paper and ink products were subject to the use tax. Act of Oct. 30, 1971, ch. 31, art. 1, § 5, subd. 1(i), 1971 Minn.Laws Sp.Sess. 2561, 2565.

The use tax on all paper and ink products obtained until January 1, 1974. On that

date, the legislature put into effect the section challenged here, which granted an exemption from the use tax only for the first $100,000 of paper and ink products consumed annually. Act of May 24, 1973, ch. 650, art. 13, § 1, 1973 Minn.Laws 1606, 1637 (codified at Minn.Stat. § 297A.14 (1980).)[2] The consequence of this exemption was a $4,000 tax credit to newspapers and other publishers.[3] Publications remained exempt from sales tax.

Respondent Star Tribune is the publishers of two newspapers in the state, one a morning paper and the other an evening paper. During 1974 and 1975, Star Tribune published the morning paper seven days per week and the evening paper six days per week. Currently, Star Tribune publishes the morning paper seven days per week and the evening paper five days per week. The physical components of Star Tribune's newspaper are, of course, newsprint and ink, the two items subject to the use tax at issue.

In 1974, Star Tribune was one of 11 publishers of daily newspapers in the State of Minnesota that consumed paper and ink products in excess of $100,000 and therefore paid the 4% use tax on the amount above that figure.[4] That year there were 388 paid circulation newspapers in the state, 29 of which were daily papers.

**2.** Minn.Stat. § 297A.14 (1980) reads in full:
297A.14 USING, STORING OR CONSUMING TANGIBLE PERSONAL PROPERTY; ADMISSIONS; UTILITIES.

For the privilege of using, storing or consuming in Minnesota tangible personal property, tickets or admissions to places of amusement and athletic events, electricity, gas, and local exchange telephone service purchased for use, storage or consumption in this state, there is hereby imposed on every person in this state a use tax at the rate of four percent of the sales price of sales at retail of any of the aforementioned items made to such person after October 31, 1971, unless the tax imposed by section 297A.02 was paid on said sales price.

Motor vehicles subject to tax under this section shall be taxed at the fair market value at the time of transport into Minnesota if such motor vehicles were acquired more than three months prior to its transport into this state.

Notwithstanding any other provisions of sections 297A.01 to 297A.44 to the contrary,

the cost of paper and ink products exceeding $100,000 in any calendar year, used or consumed in producing a publication as defined in section 297A.25, subdivision 1, clause (i) is subject to the tax imposed by this section. (The statute was recently amended. *See* note 1 *supra.*)

**3.** Publishers of more than one newspaper are entitled to a $100,000 exemption for each publication. Respondent Star Tribune is entitled to two such exemptions.

**4.** Respondent submitted the following data for 1974:

| City | Newspaper | Circulation | Taxes Paid on Newsprint and Ink |
|---|---|---|---|
| 1, 2 Minneapolis | Star (Evening) | 255,964* | $608,634 |
| | Tribune (Morning) | 233,381* | |
| | Tribune (Sunday) | 640,756* | |
| 3, 4 St. Paul | Dispatch (Evening) | 125,129 | $202,248 |
| | Pioneer Press (Morning) | 107,266 | |
| | Pioneer Press (Sunday) | 238,888 | |

In 1975, Star Tribune was one of 13 publishers of daily papers paying any use tax on ink and paper products, out of a total of 374 paid circulation newspapers in the state, 29 of which were daily papers.[5]

The data submitted by Star Tribune[6] show a rough correlation between volume of circulation and incidence and amount of use tax paid, but larger papers did not uniformly pay more use tax. In 1974, for

Note 4—Continued

| City | Newspaper | Circulation | Taxes Paid on Newsprint and Ink |
|---|---|---|---|
| 5, 6 Duluth | Herald (Evening) | 22,120 | $ 33,805 |
| | News-Tribune (Morning) | 53,559 | |
| | News-Tribune (Sunday) | 83,398 | |
| 7 Rochester | Post-Bulletin | 33,175 | $ 20,800 |
| 8 St. Cloud | Times | 26,574 | $ 14,388 |
| 9 Mankato | Mankato Free Press | 24,488 | $ 7,774 |
| 10 Winona | Winona Daily News | 21,633 | $ 3,043 |
| 11 Worthington | Worthington Daily Globe | 17,131 | $ 218 |
| 12 Willmar | West Central Daily Tribune | 16,483 | $ 1,444 |
| 13 Brainerd | Brainerd Daily Dispatch | 13,461 | –0– |
| 14 Virginia | Mesabi Daily News | 13,445 | $ 881 |
| 15 Fergus Falls | Daily Journal | 13,293 | $ 120 |
| 16 Fairmont | Sentinel | 13,000 | –0– |
| 17 Austin | Austin Daily Herald | 12,797 | –0– |
| 18 New Ulm | New Ulm Daily Journal | 12,300 | –0– |
| 19 Albert Lea | Evening Tribune | 10,829 | –0– |
| 20 Red Wing | Republican Eagle | 9,295 | –0– |
| 21 Hibbing | Hibbing Daily Tribune | 9,278 | –0– |
| 22 Faribault | Daily News | 8,861 | –0– |
| 23 Owatonna | People's Press | 7,407 | –0– |
| 24 Bemidji | The Pioneer | 6,650 | –0– |
| 25 Little Falls | Transcript | 6,411 | –0– |
| 26 Marshall | Independent | 5,630 | –0– |
| 27 International Falls | The Daily Journal | 5,256 | –0– |
| 28 Waseca | Waseca's Daily Journal | 4,856 | –0– |
| 29 Crookston | Crookston Daily Times | 4,768 | –0– |
| 30 Stillwater | Stillwater Gazette | 4,550 | –0– |
| 31 Minneapolis | Finance and Commerce | 1,782 | –0– |

* Average paid circulation twelve (12) months ended March 31, 1974.

Plaintiff's Exhibit 3. The data was compiled under the direction of plaintiff's affiant, Robert M. Shaw, the manager of the Minnesota Newspaper Association.

**5.** Respondent submitted the following data for 1975:

| City | Newspaper | Circulation | Taxes Paid on Newsprint and Ink |
|---|---|---|---|
| 1, 2 Minneapolis | Star (Evening) | 252,020* | $636,113 |
| | Tribune (Morning) | 229,769* | |
| | Tribune (Sunday) | 619,154 | |

| City | Newspaper | Circulation | Taxes Paid on Newsprint and Ink |
|---|---|---|---|
| 3, 4 St. Paul | Dispatch (Evening) | 120,288 | $217,640 |
| | Pioneer Press (Morning) | 102,395 | |
| | Pioneer Press (Sunday) | 239,118 | |
| 5, 6 Duluth | Herald (Evening) | 21,855 | $ 39,462 |
| | News-Tribune (Morning) | 51,369 | |
| | News-Tribune (Sunday) | 82,087 | |
| 7 Rochester | Post-Bulletin | 34,675 | $ 19,300 |
| 8 St. Cloud | Times | 29,473 | $ 12,613 |
| 9 Mankato | Mankato Free Press | 24,545 | $ 9,356 |
| 10 Winona | Winona Free Press | 21,633 | $ 1,691 |
| 11 Willmar | West Central Daily Tribune | 17,375 | $ 2,220 |
| 12 Worthington | Worthington Daily Globe | 17,170 | $ 926 |
| 13 Virginia | Mesabi Daily News | 13,801 | $ 2,225 |
| 14 Fergus Falls | Daily Journal | 13,647 | $ 208 |
| 15 Brainerd | Brainerd Daily Dispatch | 13,440 | $ 656 |
| 16 Fairmont | Sentinel | 12,856 | $ –0 |
| 17 Austin | Austin Daily Herald | 12,510 | $ 1,645 |
| 18 New Ulm | New Ulm Daily Journal | 12,501 | $ –0 |
| 19 Albert Lea | Evening Tribune | 11,116 | –0 |
| 20 Red Wing | Republican Eagle | 9,012 | –0 |
| 21 Hibbing | Hibbing Daily Tribune | 8,871 | –0 |
| 22 Faribault | Daily News | 8,539 | –0 |
| 23 Owatonna | People's Press | 7,177 | –0 |
| 24 Bemidji | The Pioneer | 6,600 | –0 |
| 25 Little Falls | Transcript | 6,437 | –0 |
| 26 Marshall | Independent | NA | –0 |
| 27 International Falls | The Daily Journal | 5,071 | –0 |
| 28 Waseca | Waseca's Daily Journal | 4,825 | –0 |
| 29 Crookston | Crookston Daily Times | 4,650 | –0 |
| 30 Stillwater | Stillwater Gazette | 7,000 | –0 |
| 31 Minneapolis | Finance and Commerce | 1,782 | –0 |

* Average paid circulation twelve (12) months ended March 31, 1974.

Plaintiff's Exhibit 4. This data was compiled in the same fashion as the data in footnote 4 *supra.*

**6.** See footnotes 4 and 5, *supra.*

instance, the Brainerd Daily Dispatch, a newspaper with a circulation of 13,461, paid no use tax, while the West Central Daily Tribune, circulation 16,483, paid nearly $1500 and the Worthington Daily Globe, circulation 17,131, paid just over $200. In addition to these data, respondent's affiant, Robert M. Shaw, the manager of the Minnesota Newspaper Association, stated that a newspaper published fewer than three times per week would not have consumed sufficient paper and ink to requirement payment of any use tax in 1974 and 1975. Respondent's data show that in 1974 and 1975 approximately 3% of all newspaper publishers in the State of Minnesota consumed paper and ink in excess of $100,000 annually and were therefore obligated to pay the use tax in amounts varying from $120.00 to $636,113.00. The remaining 97% paid no use tax.

## II.

The equal protection claim in this case is closely intertwined with the first amendment interests at stake. The use tax law, because it appears to treat newspaper publishers as different from industrial users of paper and ink products, may be an unconstitutional burden on newspaper publication, an expressive activity protected by the first amendment. Moreover, because it appears to treat some newspaper publishers as different from other newspaper publishers, the use tax may be unconstitutional as an unfair burden upon only a segment of the class of publishers. Although the parties have treated the equal protection and first amendment issues in separate portions of their briefs, we find that the analysis is inextricable. *See Police Department of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972). We will consider the first amendment and the equal protection claims together here.

█ In considering each of respondent's arguments, we keep in mind the strict standard that must be applied when protected first amendment rights may be infringed. *Police Department of Chicago v. Mosley*, 408 U.S. at 101 and n.8, 92 S.Ct. at 2293 and

n.8; *Williams v. Rhodes*, 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968); *Grosjean v. American Press Co.*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936); *Big Mama Rag, Inc. v. United States*, 631 F.2d 1030, 1035 (D.C.Cir.1980). We afford the legislature broad discretion in enacting tax laws, but we recognize that "[i]t is settled that speech can be effectively limited by the exercise of the taxing power." *Speiser v. Randall*, 357 U.S. 513, 518, 78 S.Ct. 1332, 1338, 2 L.Ed.2d 1460 (1958).

We first address the issue whether section 297A.14 is unconstitutional because it appears to tax newspaper publishers in a different manner than it taxes other industrial users of paper and ink products. Newspaper publishers pay the use tax on paper and ink consumed in production of their products, but other industrial users, such as printers of food wrappers, books and stationery, do not.

█ Owners of newspapers are not immune from "ordinary forms of taxation for the support of the government" on account of the first amendment guarantee of freedom of the press. *Grosjean v. American Press Co.*, 297 U.S. at 250, 56 S.Ct. at 449; *cf. Mabee v. White Plains Publishing Co.*, 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607 (1946) (first amendment does not immunize interstate newspaper publishers from requirements of Fair Labor Standards Act); *Associated Press v. NLRB*, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953 (1937) (first amendment does not immunize interstate newsgathering agency from requirements of NLRA). The question here, then, "is not whether the prospective ban burdens newspapers—it clearly may do so—but rather whether there is something special about the burden that renders it unconstitutional." *National Citizens Committee for Broadcasting v. FCC*, 555 F.2d 938, 953 (D.C.Cir.1977), *modified*, 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978).

An unconstitutional burden upon freedom of the press due to a tax measure was found in *Grosjean v. American Press Co.*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936). The State of Louisiana had imposed

a license tax only upon those publications with circulations greater than 20,000 copies per week. Just thirteen newspapers in the state qualified to pay the tax. *Id.* at 240–41, 56 S.Ct. at 445. The rate of the tax on these papers was 2% of the gross receipts from advertising.

The tax was struck down by the Supreme Court because it was a "deliberate and calculated device in the guise of a tax," enacted "with the plain purpose of penalizing the publishers and curtailing the circulation of a selected group of newspapers." *Id.* at 250–51, 56 S.Ct. at 449. The history and setting of the gross receipts tax showed that the law had been passed for this purpose because the large newspapers were carrying the banner of the political opposition to the governor of the state, Huey Long. *See Giragi v. Moore*, 49 Ariz. 74, 85–86, 64 P.2d 819, 823 (Lockwood, J., concurring), *appeal dismissed*, 301 U.S. 670, 57 S.Ct. 946, 81 L.Ed. 1334 (1937).

The Supreme Court wrote:

It is not intended by anything we have said to suggest that the owners of newspapers are immune from any of the ordinary forms of taxation for support of the government. But this is not an ordinary form of tax, but one single in kind, with a long history of hostile misuse against the freedom of the press. * * * The tax here involved is bad not because it takes money from the pockets of the [publisher]. If that were all, a wholly different question would be presented. It is bad because, in the light of its history and of its present setting, it is seen to be a deliberate and calculated device in the guise of a tax to limit the circulation of information to which the public is entitled in virtue of the constitutional guaranties.

297 U.S. at 250,[7] 56 S.Ct. at 449.

Following *Grosjean*, two courts invalidated taxes as unconstitutional burdens upon freedom of the press. *Mayor of Baltimore v. A. S. Abell Co.*, 218 Md. 273, 145 A.2d 111

(1958); *City of Tampa v. Tampa Times Co.*, 153 Fla. 709, 15 So.2d 612 (1943). The tax struck down in *City of Tampa* was a business license tax which increased dramatically with increased circulation: a $40 tax for newspapers and periodicals with a circulation under 10,000, increasing to $500 when circulation was between 10,000 and 30,000, and finally reaching $700 when circulation rose above 30,000. The court there concluded that *Grosjean* invalidated any license tax "based on volume of circulation and graduated by scale * * *." 153 Fla. at 711, 15 So.2d at 613.

The ordinances struck down in *Mayor of Baltimore* were municipal taxes imposed upon buyers of advertising in the Baltimore media in the amount of 4% of the gross sales price and upon sellers at 2%. The court found these taxes unconstitutional because they were not ordinary or general but were single in kind, falling not upon all modes of advertising but only upon advertising in newspapers, radio, and television. 218 Md. at 288–89, 145 A.2d at 119.

In the wake of *Grosjean, Giragi v. Moore*, 49 Ariz. 74, 64 P.2d 819, *appeal dismissed*, 301 U.S. 670, 57 S.Ct. 946, 81 L.Ed. 1334 (1937), sustained a privilege tax of 1% of the gross proceeds of sales or gross income of the business of publishing newspapers, periodicals, and other publications. The court there found that the tax was a revenue-raising measure, without hostility to the press, and part of a general sales tax. 49 Ariz. at 79, 64 P.2d at 821.

A 3% tax upon advertising that included advertising in newspapers was upheld in *Lee Enterprises, Inc. v. Iowa State Tax Commission*, 162 N.W.2d 730 (Iowa 1968). The tax at issue was part of a general revenue-raising measure imposed upon all advertisers. *Id.* at 755. So, too, in *Territory of Alaska v. Journal Printing Co.*, 135 F.Supp. 169 (D.Alaska 1955), a business license tax was upheld that is similar to the tax at issue here: printing shops and pub-

**7.** In interpreting the *Grosjean* case, it is also noteworthy that gross receipts taxes on advertising were relatively new tax devices and were uncommon at the time; sales and use taxes are widespread today. Conlon, *Forward*, 9 Vand.L. Rev. 121 (1956) (forward to symposium on sales and use taxation).

lishers of newspapers were required to pay $25 plus .5% of gross receipts in excess of $20,000. *Accord, City of Corona v. Corona Daily Independent*, 115 Cal.App.2d 382, 252 P.2d 56 (1953) (nominal annual business license tax); *Donnelley Corp. v. City of Bellevue*, 283 Ky. 152, 140 S.W.2d 1024 (1940) (occupational license tax); *Steinbeck v. Gerosa*, 4 N.Y.2d 302, 151 N.E.2d 170, 175 N.Y.S.2d 1, *appeal dismissed*, 358 U.S. 39, 79 S.Ct. 64, 3 L.Ed.2d 45 (1958) (general gross receipts tax).

■ The history and setting of section 297A.14, reviewed at the start of this opinion, reveal that it is not a deliberate and calculated device in the guise of a tax imposed purposefully to restrict dissemination of the news and opinions appearing in newspapers distributed by publishers such as Star Tribune. It is part of a general system of sales and use taxation to which most goods (other than food, clothing, and medicine) are subject in Minnesota.[8] Unlike the type of tax found to be unconstitutional in *Grosjean*, sales and use taxes are now commonplace and readily accepted. *See, e.g.*, Northrup, *The Measure of Sales Taxes*, 9 Vand.L.Rev. 238 (1956); Note, *Developments in the Law—Federal Limitations on State Taxation of Interstate Business*, 75 Harv.L.Rev. 953, 994 (1962) (hereinafter cited as *Developments*).[9] This type of taxation has no "long history of hostile misuse against the freedom of the press." *Grosjean*, 297 U.S. at 250, 56 S.Ct. at 449.

Even the classification made by Minnesota's sales and use tax laws between publishers and nonpublishers does not render section 297A.14 unconstitutional under any standard of review, and in particular under the strict standard we apply here. The sales and use tax law is a revenue-raising measure. This is perhaps the most compelling goal of a state government. Nonpublishers pay no use tax on consumption of paper and ink, but the goods they produce are subject to retail sales tax. Theoretically, the value of the paper and ink is reflected in the retail price that forms the basis of the sales tax. Newspapers and periodicals circulating at regular intervals not exceeding three months are not subject to retail sales tax. This may be a result of the difficulties and expense of collecting sales tax upon sales of such low-priced items.[10] Instead of the sales tax, these items are subject to use tax. There is no reason to believe that this legislative choice is insufficiently tailored to achieve the goal of raising revenue or that it burdens the first amendment in any way whatsoever. "The broad discretion as to classification possessed by a legislature in the field of taxation has long been recognized." *Madden v. Kentucky*, 309 U.S. 83, 87–88, 60 S.Ct. 406, 407–408, 84 L.Ed. 590 (1940).

But respondent contends that the purpose of the use tax on paper and ink cannot be said to be raising revenue because nonpublishers are exempt. By exempting industri-

---

8. Iowa imposes a similar tax on newsprint and ink. Iowa Code Ann. § 423.1, subd. 1 (West Supp.1980).

9. Indeed, what was once the major constitutional challenge to use taxation, violation of the commerce clause, is now resolved beyond doubt: "The compensating use tax is now so common that its validity has been virtually removed from the area of debate. If the burden imposed by a use tax is 'equal' to that imposed by a sales tax, the former is considered valid under the commerce clause." Note, *Economic Neutrality and the Compensating Use Tax*, 16 Stan.L.Rev. 1016, 1017 (1964) (footnote omitted).

10. Respondents suggest that newspapers and periodicals could not constitutionally be subjected to sales tax. This issue is not before us. But we note that books, for instance, are sub-

ject to retail sales taxes, even though they are clearly protected by the first amendment. We note also that several other states apply a sales tax to newspapers. Under Okla.Stat.Ann. tit. 68, § 1305(h) (West Cum.Supp.1980–1981), carrier sales of newspapers and periodicals made directly to consumers are exempt, but other sales of these are taxed when the sale is over 75 cents. Newsstand sales of daily publications or those issued at regular intervals not exceeding three months are taxed in Virginia, while other sales of these are exempt. Va. Code § 58–441.6(k) (1974). West Virginia, too, exempts carrier sales but not other sales. W.Va.Code § 11–15–9(12) (Cum.Supp.1981). Sales of newspapers were taxed in Wyoming, but are now exempt. Wyo.Stat. § 39–6–405(a)(xxi) (Cum.Supp.1981).

al users from the use tax, the legislature was acting in accordance with its general scheme to exempt component parts from the use tax when the completed product is subject to sales tax. *Standard Packaging Corp. v. Commissioner of Revenue*, 288 N.W.2d 234, 237–38 (Minn.1979).

Respondent further claims that the differing treatment under the use tax cannot be explained by reference to the different treatment under the sales tax. Respondent contends that the sales tax is paid by the consumer and the use tax by the producer. This argument is also without merit. In all cases, producers of goods are free to assume the burden of any tax or pass some part of it on to consumers in the form of higher retail prices. *See Developments*, 75 Harv.L. Rev. at 994.

Additionally, respondent claims that section 297A.14 is unconstitutional simply because publishers have been chosen as a subject of direct taxation. Respondent claims that *Follett v. Town of McCormick*, 321 U.S. 573, 577, 64 S.Ct. 717, 719, 88 L.Ed. 938 (1944), *Jones v. City of Opelika*, 319 U.S. 103, 63 S.Ct. 890, 87 L.Ed. 1290 (1943), and *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943), establish the proposition that no first amendment activity may be taxed directly. Those cases are inapposite here. *Steinbeck v. Gerosa*, 4 N.Y.2d 302, 313, 151 N.E.2d 170, 176, 175 N.Y.S.2d 1, 9, *appeal dismissed*, 358 U.S. 39, 79 S.Ct. 64, 3 L.Ed.2d 45 (1958). Each involved a general ordinance which was applied to require distributors or nonprofit sellers of religious material to pay a fee for a license to sell or distribute their material; none considered the question of the application of an ordinary use tax to revenue-producing, commercial activity throughout the state.

### III.

We now consider whether section 297A.14 is unconstitutional because it exempts from use tax the first $100,000 of paper and ink products consumed annually. The practical effect of this exemption during 1974 and 1975 was to relieve from payment of use tax all but a dozen or so publishers.

Respondent claims that the exemption discourages newspapers from increasing their circulation, inducing them to stay beneath the $100,000 paper and ink consumption level to avoid paying use tax. A passage from *Grosjean v. American Press Co.* indicates that part of the reason the Louisiana tax was repugnant to the first amendment was its effect of discouraging circulation.

[The tax] thus operates as a restraint in a double sense. First, its effect is to curtail the amount of revenue realized from advertising, and, second, its direct tendency is to restrict circulation. This is plain enough when we consider that, if it were increased to a high degree, as it could be if valid * * * it well might result in destroying both advertising and circulation.

297 U.S. at 244–45, 56 S.Ct. at 447.

We have held that section 297A.14 is not a "deliberate and calculated device" to restrict circulation. But respondent claims that section 297A.14 is invalid even if the restriction of circulation is unintended. *City of Tampa v. Tampa Times Co.*, 153 Fla. 709, 15 So.2d 612 (1943), and *Mayor of Baltimore v. A. S. Abell Co.*, 218 Md. 273, 145 A.2d 111 (1958), discussed above, are relied upon by respondent. The license tax in *City of Tampa* was found unconstitutional because it was graduated by volume of circulation. 153 Fla. at 711, 15 So.2d at 613. The tax in *Mayor of Baltimore* was found unconstitutional because it singled out the media even though the court detected no "ulterior, malevolent or untoward motive," 218 Md. at 280, 145 A.2d at 114.

Section 297A.14, when viewed in the overall scheme of the state's sales and use taxes, does not single out newspapers. Nor is the exemption in section 297A.14 literally dependent upon circulation. Indeed, the figure in section 297A.14 is only indirectly related to circulation, if at all. Consumption of paper and ink is tied to size and number of pages as well as quantity of copies. As noted at the beginning of this

opinion, circulation figures correlate with payment of the use tax only roughly. *In Tampa Times Co. v. City of Tampa*, 158 Fla. 589, 29 So.2d 368, *appeal dismissed*, 332 U.S. 749, 68 S.Ct. 69, 92 L.Ed. 336 (1947), the court *upheld* a license fee imposed upon business activities including publishing. The tax consisted of a $10 fee on the first $3,000 of gross advertising receipts and $1.00 on each $1,000 above that. The *indirect* relationship to circulation that such dollar cutoffs implied was not sufficient to invalidate the tax. Accordingly, we need not invalidate a tax law which "may indirectly affect the economics of publication." *National Citizens Committee for Broadcasting v. FCC*, 555 F.2d 938, 954 (D.C.Cir.1977), *modified*, 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978).

■ Respondent also claims that section 297A.14 is flawed because it is "graduated," imposing a 0% rate on the first $100,000 of paper and ink consumed and a 4% rate thereafter. Such a "graduated" use tax, argues respondent, cannot be said to be even rationally related to the purpose of the tax.

Graduated gross sales taxes imposed upon sellers have been found to be unconstitutional. *Stewart Dry Goods Co. v. Lewis*, 294 U.S. 550, 55 S.Ct. 525, 79 L.Ed. 1054 (1935); *National Tea Co. v. State*, 205 Minn. 443, 286 N.W. 360 (1939), *vacated and remanded*, 309 U.S. 551, 60 S.Ct. 676, 84 L.Ed. 920, *affirmed on remand*, 208 Minn. 607, 294 N.W. 230 (1940). In *Stewart Dry Goods*, the court found a gross sales tax, which taxed the first $400,000 of gross sales at one rate and increased the rate for each additional $100,000, up to $1,000,000, to be a denial of equal protection. It was suggested that the higher tax rates imposed upon higher volumes of gross sales were justified because the tax was a privilege tax and the value of the privilege increased when gross sales increased. It was argued that a seller's net income and ability to pay increased as volume of sales increased. But the Court found that this alleged relationship between gross sales, ability to pay, and value of the privilege was nonexistent. Wrote the Court: "The law arbitrarily classifies these vendors for the imposition of a varying rate of taxation, solely by reference to the volume of their transactions, disregarding the absence of any reasonable relation between the chosen criterion of classification and the privilege the enjoyment of which is said to be the subject taxed." 294 U.S. at 566, 55 S.Ct. at 532.

*National Tea* involved the invalidation in Minnesota of a similar tax imposed only upon chain stores. Chain stores were classified by gross sales into eleven categories that imposed taxes at increasing rates. As in *Stewart Dry Goods*, no relationship was found between the privilege of selling and the higher tax extracted for greater volume of selling.

We do not find the reasoning of *Stewart Dry Goods* and *National Tea* persuasive in the context of this case. Section 297A.14 differs from the taxes rejected in those cases. It is not a "privilege" tax, supposedly justified because the value of the "privilege" increases in the higher brackets. Rather, the use tax is constitutionally justified, as we said in Part II of this opinion, as a revenue-raising measure. The $100,000 exemption itself is justified if it is an integral part of the sales and use tax system.

It was suggested by the Commissioner of Revenue that the legislative choice to grant a use tax exemption for the first $100,000 of paper and ink consumed may be justified as a legislative policy to give favorable tax treatment to smaller enterprises. *Cf. Mabee v. White Plains Publishing Co.*, 327 U.S. 178, 184, 66 S.Ct. 511, 514, 90 L.Ed. 607 (1946) (similar justification proffered). Moreover, it is necessary for the legislature to construct economically sound taxes in order to raise revenue. In order to do so, the legislature must classify or grant exemptions to insure that the burden upon the taxpayer in paying the tax or upon the state in collecting the tax does not outweigh the benefit of the revenues to the state. "Traditionally classification has been a device for fitting tax programs to local needs and usages in order to achieve an equitable distribution of the tax burden."

*Madden v. Kentucky,* 309 U.S. 83, 88, 60 S.Ct. 406, 408, 84 L.Ed. 590 (1940). We do not doubt that the $100,000 exemption, in the context of the sales and use tax, does not offend first amendment rights.

We reject respondent's contention that the legislature may not create a tax exemption which favors publishing enterprises unequally. Respondent argues that *Buckley v. Valeo,* 424 U.S. 1, 48–49, 96 S.Ct. 612, 648–49, 46 L.Ed.2d 659 (1976), establishes the government may not "restrict the speech of some elements of our society in order to enhance the relative voice of others." In *Buckley v. Valeo,* the Supreme Court considered the constitutionality of the numerous provisions of the Federal Election Campaign Act of 1971. The statement cited by respondent was made in connection with the Court's discussion of the provision of the Act which limited to $1,000 the contribution individuals or groups could make "relative to a clearly identified candidate." The Court found this limitation a burden on speech and association not justified by the proffered governmental interests. The above statement was made when, after rejecting the primary interest, the Court also rejected the "ancillary governmental interest in equalizing the relative ability of individuals and groups to influence the outcome of elections," *id.* at 48, 96 S.Ct. at 649.

Neither the purpose nor the effect of section 297A.14 is to enhance the voice of one newspaper relative to another newspaper. The expenditure limitations found unconstitutional in *Buckley* were restrictions upon the total amount of money that could be spent by persons during a campaign. Such limitations were "substantial rather than merely theoretical restraints on the quantity and diversity of political speech." *Id.* at 19, 96 S.Ct. at 635. By contrast, section 297A.14 is part of a general revenue-raising measure. Newspaper publishers are not prohibited from spending more than a given amount. The use tax may theoretically reduce the amount of money they may spend by reducing available capital. But all taxes do as much. There is

nothing special about this form of taxation which elevates to a constitutional plane these theoretical effects on "quantity" or "diversity."

In conclusion, we find that section 297A.14 offends neither the first amendment nor the equal protection clause of the fourteenth amendment. Accordingly, we reverse the judgment of the district court.

Reversed.