# MINNEAPOLIS STAR & TRIBUNE CO. *v.* MINNESOTA COMMISSIONER OF REVENUE

No. 81–1839.   Argued January 12, 1983—Decided March 29, 1983

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, POWELL, and STEVENS, JJ., joined, in Part V of which WHITE, J., joined, and in all but footnote 12 of which BLACKMUN, J., joined. WHITE, J., filed an opinion concurring in part and dissenting in part, *post*, p. 593. REHNQUIST, J., filed a dissenting opinion, *post*, p. 596.

*Lawrence C. Brown* argued the cause for appellant. With him on the briefs were *John D. French, John P. Borger,* and *Norton L. Armour.*

*Paul R. Kempainen,* Special Assistant Attorney General of Minnesota, argued the cause for appellee. With him on the brief was *Warren Spannaus,* Attorney General.*

JUSTICE O'CONNOR delivered the opinion of the Court.†

This case presents the question of a State's power to impose a special tax on the press and, by enacting exemptions, to limit its effect to only a few newspapers.

---

*Briefs of *amici curiae* urging reversal were filed by *Peter W. Schroth* and *Charles S. Sims* for the American Civil Liberties Union et al.; and by *Philip A. Lacovara, W. Terry Maguire,* and *Pamela J. Riley* for Knight-Ridder Newspapers, Inc., et al.

†JUSTICE BLACKMUN joins this opinion except footnote 12.

# I

Since 1967, Minnesota has imposed a sales tax on most sales of goods for a price in excess of a nominal sum.[1]  Act of June 1, 1967, ch. 32, Art. XIII, § 2, 1967 Minn. Laws 2143, 2179, codified at Minn. Stat. § 297A.02 (1982).  In general, the tax applies only to retail sales.  *Ibid.*  An exemption for industrial and agricultural users shields from the tax sales of components to be used in the production of goods that will themselves be sold at retail.  § 297A.25(1)(h).  As part of this general system of taxation and in support of the sales tax, see Minn. Code of Agency Rules, Tax S & U 300 (1979), Minnesota also enacted a tax on the "privilege of using, storing or consuming in Minnesota tangible personal property."  This use tax applies to any nonexempt tangible personal property unless the sales tax was paid on the sales price.  Minn. Stat. § 297A.14 (1982).  Like the classic use tax, this use tax protects the State's sales tax by eliminating the residents' incentive to travel to States with lower sales taxes to buy goods rather than buying them in Minnesota. §§ 297A.14, 297A.24.

The appellant, Minneapolis Star & Tribune Co., "Star Tribune," is the publisher of a morning newspaper and an evening newspaper (until 1982) in Minneapolis.  From 1967 until 1971, it enjoyed an exemption from the sales and use tax provided by Minnesota for periodic publications.  1967 Minn. Laws 2187, codified at Minn. Stat. § 297A.25(1)(i) (1982). In 1971, however, while leaving the exemption from the sales tax in place, the legislature amended the scheme to impose a "use tax" on the cost of paper and ink products consumed in the production of a publication.  Act of Oct. 31, 1971, ch. 31, Art. I, § 5, 1971 Minn. Laws 2561, 2565, codified

---

[1] Currently, the tax applies to sales of items for more than 9¢.  Minn. Stat. § 297A.03(2) (1982).  When first enacted, the threshold amount was 16¢.  Act of June 1, 1967, ch. 32, Art. XIII, § 3(2), 1967 Minn. Laws 2143, 2180.

with modifications at Minn. Stat. §§ 297A.14, 297A.25(1)(i) (1982). Ink and paper used in publications became the only items subject to the use tax that were components of goods to be sold at retail. In 1974, the legislature again amended the statute, this time to exempt the first $100,000 worth of ink and paper consumed by a publication in any calendar year, in effect giving each publication an annual tax credit of $4,000. Act of May 24, 1973, ch. 650, Art. XIII, § 1, 1973 Minn. Laws 1606, 1637, codified at Minn. Stat. § 297A.14 (1982).[2] Publications remained exempt from the sales tax, § 2, 1973 Minn. Laws 1639.

After the enactment of the $100,000 exemption, 11 publishers, producing 14 of the 388 paid circulation newspapers in the State, incurred a tax liability in 1974. Star Tribune was one of the 11, and, of the $893,355 collected, it paid $608,634, or roughly two-thirds of the total revenue raised by the tax.

---

[2] After the 1974 amendment, the use tax provision read in full:

"For the privilege of using, storing or consuming in Minnesota tangible personal property, tickets or admissions to places of amusement and athletic events, electricity, gas, and local exchange telephone service purchased for use, storage or consumption in this state, there is hereby imposed on every person in this state a use tax at the rate of four percent of the sales price of sales at retail of any of the aforementioned items made to such person after October 31, 1971, unless the tax imposed by section 297A.02 [the sales tax] was paid on said sales price.

"Motor vehicles subject to tax under this section shall be taxed at the fair market value at the time of transport into Minnesota if such motor vehicles were acquired more than three months prior to its [sic] transport into this state.

"Notwithstanding any other provisions of section 297A.01 to 297A.44 to the contrary, the cost of paper and ink products exceeding $100,000 in any calendar year, used or consumed in producing a publication as defined in section 297A.25, subdivision 1, clause (i) is subject to the tax imposed by this section." 1973 Minn. Laws 1637, codified at Minn. Stat. § 297A.14 (1982).

The final paragraph was the only addition of the 1974 amendment. The provision has since been amended to increase the rate of the tax, Act of June 6, 1981, ch. 1, Art. IV, § 5, 1981 Minn. Laws 2396, but has not been changed in any way relevant to this litigation.

See 314 N. W. 2d 201, 203, and n. 4 (1981). In 1975, 13 publishers, producing 16 out of 374 paid circulation papers, paid a tax. That year, Star Tribune again bore roughly two-thirds of the total receipts from the use tax on ink and paper. *Id.*, at 204, and n. 5.

Star Tribune instituted this action to seek a refund of the use taxes it paid from January 1, 1974, to May 31, 1975. It challenged the imposition of the use tax on ink and paper used in publications as a violation of the guarantees of freedom of the press and equal protection in the First and Fourteenth Amendments. The Minnesota Supreme Court upheld the tax against the federal constitutional challenge. 314 N. W. 2d 201 (1981). We noted probable jurisdiction, 457 U. S. 1130 (1982), and we now reverse.

## II

Star Tribune argues that we must strike this tax on the authority of *Grosjean* v. *American Press Co.*, 297 U. S. 233 (1936). Although there are similarities between the two cases, we agree with the State that *Grosjean* is not controlling.

In *Grosjean*, the State of Louisiana imposed a license tax of 2% of the gross receipts from the sale of advertising on all newspapers with a weekly circulation above 20,000. Out of at least 124 publishers in the State, only 13 were subject to the tax. After noting that the tax was "single in kind" and that keying the tax to circulation curtailed the flow of information, *id.*, at 250–251, this Court held the tax invalid as an abridgment of the freedom of the press. Both the brief and the argument of the publishers in this Court emphasized the events leading up to the tax and the contemporary political climate in Louisiana. See Argument for Appellees, *id.*, at 238; Brief for Appellees, O. T. 1936, No. 303, pp. 8–9, 30. All but one of the large papers subject to the tax had "ganged up" on Senator Huey Long, and a circular distributed by Long and the Governor to each member of the state legisla-

ture described "lying newspapers" as conducting "a vicious campaign" and the tax as "a tax on lying, 2c *[sic]* a lie." *Id.*, at 9. Although the Court's opinion did not describe this history, it stated "[the tax] is bad because, in the light of its history and of its present setting, it is seen to be a deliberate and calculated device in the guise of a tax to limit the circulation of information," 297 U. S., at 250, an explanation that suggests that the motivation of the legislature may have been significant.

Our subsequent cases have not been consistent in their reading of *Grosjean* on this point. Compare *United States* v. *O'Brien*, 391 U. S. 367, 384–385 (1968) (stating that legislative purpose was irrelevant in *Grosjean*), with *Houchins* v. *KQED, Inc.*, 438 U. S. 1, 9–10 (1978) (plurality opinion) (suggesting that purpose was relevant in *Grosjean*); *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations*, 413 U. S. 376, 383 (1973) (same). Commentators have generally viewed *Grosjean* as dependent on the improper censorial goals of the legislature. See T. Emerson, The System of Freedom of Expression 419 (1970); L. Tribe, American Constitutional Law 592, n. 8, 724, n. 10 (1978). We think that the result in *Grosjean* may have been attributable in part to the perception on the part of the Court that the State imposed the tax with an intent to penalize a selected group of newspapers. In the case currently before us, however, there is no legislative history[3] and no indication, apart from the structure of the tax itself, of any impermissible or censorial motive on the part of the legislature. We cannot resolve the case by simple citation to *Grosjean*. Instead, we must analyze the problem anew under the general principles of the First Amendment.

---

[3] Although the Minnesota Legislature records some proceedings and preserves the recordings, it has specifically provided that those recordings are not to be considered as evidence of legislative intent. See Minnesota Legislative Manual, Rule 1.18, Rules of the Minn. House of Representatives; Rule 65, Permanent Rules of the Senate (1981–1982). There is no evidence of legislative intent on the record in this litigation.

## III

Clearly, the First Amendment does not prohibit all regulation of the press. It is beyond dispute that the States and the Federal Government can subject newspapers to generally applicable economic regulations without creating constitutional problems. See, *e. g., Citizen Publishing Co.* v. *United States,* 394 U. S. 131, 139 (1969) (antitrust laws); *Lorain Journal Co.* v. *United States,* 342 U. S. 143, 155–156 (1951) (same); *Breard* v. *Alexandria,* 341 U. S. 622 (1951) (prohibition of door-to-door solicitation); *Oklahoma Press Publishing Co.* v. *Walling,* 327 U. S. 186, 192–193 (1946) (Fair Labor Standards Act); *Mabee* v. *White Plains Publishing Co.,* 327 U. S. 178 (1946) (same); *Associated Press* v. *United States,* 326 U. S. 1, 6–7, 19–20 (1945) (antitrust laws); *Associated Press* v. *NLRB,* 301 U. S. 103, 132–133 (1937) (National Labor Relations Act); see also *Branzburg* v. *Hayes,* 408 U. S. 665 (1972) (enforcement of subpoenas). Minnesota, however, has not chosen to apply its general sales and use tax to newspapers. Instead, it has created a special tax that applies only to certain publications protected by the First Amendment. Although the State argues now that the tax on paper and ink is part of the general scheme of taxation, the use tax provision, quoted in n. 2, *supra,* is facially discriminatory, singling out publications for treatment that is, to our knowledge, unique in Minnesota tax law.

Minnesota's treatment of publications differs from that of other enterprises in at least two important respects:[4] it imposes a use tax that does not serve the function of protecting the sales tax, and it taxes an intermediate transaction rather than the ultimate retail sale. A use tax ordinarily serves to complement the sales tax by eliminating the incentive to make major purchases in States with lower sales taxes; it re-

---

[4] A third difference is worth noting, though it may have little economic effect. The use tax is not visible to consumers, while the sales tax must, by law, be stated separately as an addition to the price. See Minn. Stat. § 297A.03(1) (1982).

quires the resident who shops out-of-state to pay a use tax equal to the sales tax savings. *E. g.*, *National Geographic Society* v. *California Board of Equalization*, 430 U. S. 551, 555 (1977); P. Hartman, Federal Limitations on State and Local Taxation §§ 10:1, 10:5 (1981); Warren & Schlesinger, Sales and Use Taxes: Interstate Commerce Pays Its Way, 38 Colum. L. Rev. 49, 63 (1938). Minnesota designed its overall use tax scheme to serve this function. As the regulations state, "[t]he 'use tax' is a compensating or complementary tax." Minn. Code of Agency Rules, Tax S & U 300 (1979); see Minn. Stat. § 297A.24 (1982). Thus, in general, items exempt from the sales tax are not subject to the use tax, for, in the event of a sales tax exemption, there is no "complementary function" for a use tax to serve. See *DeLuxe Check Printers, Inc.* v. *Commissioner of Tax*, 295 Minn. 76, 203 N. W. 2d 341, 343 (1972). But the use tax on ink and paper serves no such complementary function; it applies to all uses, whether or not the taxpayer purchased the ink and paper instate, and it applies to items exempt from the sales tax.

Further, the ordinary rule in Minnesota, as discussed above, is to tax only the ultimate, or retail, sale rather than the use of components like ink and paper. "The statutory scheme is to devise a unitary tax which exempts intermediate transactions and imposes it only on sales when the finished product is purchased by the ultimate user." *Standard Packaging Corp.* v. *Commissioner of Revenue*, 288 N. W. 2d 234, 239 (Minn. 1979). Publishers, however, are taxed on their purchase of components, even though they will eventually sell their publications at retail.

By creating this special use tax, which, to our knowledge, is without parallel in the State's tax scheme, Minnesota has singled out the press for special treatment. We then must determine whether the First Amendment permits such special taxation. A tax that burdens rights protected by the First Amendment cannot stand unless the burden is necessary to achieve an overriding governmental interest. See,

*e. g.*, *United States* v. *Lee,* 455 U. S. 252 (1982). Any tax that the press must pay, of course, imposes some "burden." But, as we have observed, see *supra,* at 581, this Court has long upheld economic regulation of the press. The cases approving such economic regulation, however, emphasized the general applicability of the challenged regulation to all businesses, *e. g.*, *Oklahoma Press Publishing Co.* v. *Walling, supra,* at 194; *Mabee* v. *White Plains Publishing Co., supra,* at 184; *Associated Press* v. *NLRB, supra,* at 132–133,[5] suggesting that a regulation that singled out the press might place a heavier burden of justification on the State, and we now conclude that the special problems created by differential treatment do indeed impose such a burden.

There is substantial evidence that differential taxation of the press would have troubled the Framers of the First Amendment.[6] The role of the press in mobilizing senti-

---

[5] The Court recognized in *Oklahoma Press* that the FLSA excluded seamen and farmworkers. See 327 U. S., at 193. It rejected, however, the publisher's argument that the exclusion of these workers precluded application of the law to the employees of newspapers. The State here argues that *Oklahoma Press* establishes that the press cannot successfully challenge regulations on the basis of the exemption of other enterprises. We disagree. The exempt enterprises in *Oklahoma Press* were isolated exceptions and not the rule. Here, everything is exempt from the use tax on ink and paper, except the press.

[6] It is true that our opinions rarely speculate on precisely how the Framers would have analyzed a given regulation of expression. In general, though, we have only limited evidence of exactly how the Framers intended the First Amendment to apply. There are no recorded debates in the Senate or in the States, and the discussion in the House of Representatives was couched in general terms, perhaps in response to Madison's suggestion that the Representatives not stray from simple acknowledged principles. See Constitution of the United States: Analysis and Interpretation, S. Doc. No. 92–82, p. 936, and n. 5 (1973); see also Z. Chafee, Free Speech in the United States 16 (1941). Consequently, we ordinarily simply apply those general principles, requiring the government to justify any burdens on First Amendment rights by showing that they are necessary to achieve a legitimate overriding governmental interest, see n. 7,

ment in favor of independence was critical to the Revolution. When the Constitution was proposed without an explicit guarantee of freedom of the press, the Antifederalists objected. Proponents of the Constitution, relying on the principle of enumerated powers, responded that such a guarantee was unnecessary because the Constitution granted Congress no power to control the press. The remarks of Richard Henry Lee are typical of the rejoinders of the Antifederalists:

> "I confess I do not see in what cases the congress can, with any pretence of right, make a law to suppress the freedom of the press; though I am not clear, that congress is restrained from laying any duties whatever on printing, and from laying duties particularly heavy on certain pieces printed . . . ." R. Lee, Observation Leading to a Fair Examination of the System of Government, Letter IV, reprinted in 1 B. Schwartz, The Bill of Rights: A Documentary History 466, 474 (1971).

See also A Review of the Constitution Proposed by the Late Convention by a Federal Republican, reprinted in 3 H. Storing, The Complete Anti-Federalist 65, 81–82 (1981); M. Smith, Address to the People of New York on the Necessity of Amendments to the Constitution, reprinted in 1 B. Schwartz, *supra*, at 566, 575–576; cf. The Federalist No. 84, p. 440, and n. 1 (A. Hamilton) (M. Beloff ed. 1948) (recognizing and attempting to refute the argument). The concerns voiced by the Antifederalists led to the adoption of the Bill of Rights. See 1 B. Schwartz, *supra*, at 527.

---

*infra.* But when we do have evidence that a particular law would have offended the Framers, we have not hesitated to invalidate it on that ground alone. Prior restraints, for instance, clearly strike to the core of the Framers' concerns, leading this Court to treat them as particularly suspect. *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697, 713, 716–718 (1931); cf. *Grosjean* v. *American Press Co.,* 297 U. S. 233 (1936) (relying on the role of the "taxes on knowledge" in inspiring the First Amendment to strike down a contemporary tax on knowledge).

The fears of the Antifederalists were well founded. A power to tax differentially, as opposed to a power to tax generally, gives a government a powerful weapon against the taxpayer selected. When the State imposes a generally applicable tax, there is little cause for concern. We need not fear that a government will destroy a selected group of taxpayers by burdensome taxation if it must impose the same burden on the rest of its constituency. See *Railway Express Agency, Inc.* v. *New York*, 336 U. S. 106, 112–113 (1949) (Jackson, J., concurring). When the State singles out the press, though, the political constraints that prevent a legislature from passing crippling taxes of general applicability are weakened, and the threat of burdensome taxes becomes acute. That threat can operate as effectively as a censor to check critical comment by the press, undercutting the basic assumption of our political system that the press will often serve as an important restraint on government. See generally Stewart, "Or of the Press," 26 Hastings L. J. 631, 634 (1975). "[A]n untrammeled press [is] a vital source of public information," *Grosjean*, 297 U. S., at 250, and an informed public is the essence of working democracy.

Further, differential treatment, unless justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional. See, *e. g.*, *Police Department of Chicago* v. *Mosley*, 408 U. S. 92, 95–96 (1972); cf. *Brown* v. *Hartlage*, 456 U. S. 45 (1982) (First Amendment has its "fullest and most urgent" application in the case of regulation of the content of political speech). Differential taxation of the press, then, places such a burden on the interests protected by the First Amendment that we cannot countenance such treatment unless the State asserts a counterbalancing interest of compelling importance that it cannot achieve without differential taxation.[7]

---

[7] JUSTICE REHNQUIST's dissent analyzes this case solely as a problem of equal protection, applying the familiar tiers of scrutiny. *Post*, at 599–

## IV

The main interest asserted by Minnesota in this case is the raising of revenue. Of course that interest is critical to any government. Standing alone, however, it cannot justify the special treatment of the press, for an alternative means of achieving the same interest without raising concerns under the First Amendment is clearly available: the State could raise the revenue by taxing businesses generally,[8] avoiding the censorial threat implicit in a tax that singles out the press.

Addressing the concern with differential treatment, Minnesota invites us to look beyond the form of the tax to its substance. The tax is, according to the State, merely a substitute for the sales tax, which, as a generally applicable tax, would be constitutional as applied to the press.[9] There are

---

600. We, however, view the problem as one arising directly under the First Amendment, for, as our discussion shows, the Framers perceived singling out the press for taxation as a means of abridging the freedom of the press, see n. 6, *supra.* The appropriate method of analysis thus is to balance the burden implicit in singling out the press against the interest asserted by the State. Under a long line of precedents, the regulation can survive only if the governmental interest outweighs the burden and cannot be achieved by means that do not infringe First Amendment rights as significantly. See, *e. g., United States* v. *Lee,* 455 U. S. 252, 257–258, 259 (1982); *United States* v. *O'Brien,* 391 U. S. 367, 376–377; *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449 (1958).

[8] Cf. *United States* v. *Lee, supra* (generally applicable tax may be applied to those with religious objections).

[9] Star Tribune insists that the premise of the State's argument—that a generally applicable sales tax would be constitutional—is incorrect, citing *Follett* v. *McCormick,* 321 U. S. 573 (1944), *Murdock* v. *Pennsylvania,* 319 U. S. 105 (1943), and *Jones* v. *Opelika,* 319 U. S. 103 (1943). We think that *Breard* v. *Alexandria,* 341 U. S. 622 (1951), is more relevant and rebuts Star Tribune's argument. There, we upheld an ordinance prohibiting door-to-door solicitation, even though it applied to prevent the door-to-door sale of subscriptions to magazines, an activity covered by the First Amendment. Although *Martin* v. *Struthers,* 319 U. S. 141 (1943), had struck down a similar ordinance as applied to the distribution of free religious literature, the *Breard* Court explained that case as emphasizing

two fatal flaws in this reasoning. First, the State has offered no explanation of why it chose to use a substitute for the sales tax rather than the sales tax itself. The court below speculated that the State might have been concerned that collection of a tax on such small transactions would be impractical. 314 N. W. 2d, at 207. That suggestion is unpersuasive, for sales of other low-priced goods are not exempt, see n. 1, *supra.*[10] If the real goal of this tax is to dupli-

that the information distributed was religious in nature and that the distribution was noncommercial. 341 U. S., at 642–643. As the dissent in *Breard* recognized, the majority opinion substantially undercut both *Martin* and the cases now relied upon by Star Tribune, in which the Court had invalidated ordinances imposing a flat license tax on the sale of religious literature. See 341 U. S., at 649–650 (Black, J., dissenting) ("Since this decision cannot be reconciled with the *Jones, Murdock* and *Martin* v. *Struthers* cases, it seems to me that good judicial practice calls for their forthright overruling"). Whatever the value of those cases as authority after *Breard,* we think them distinguishable from a generally applicable sales tax. In each of those cases, the local government imposed a flat tax, unrelated to the receipts or income of the speaker or to the expenses of administering a valid regulatory scheme, as a *condition* of the right to speak. By imposing the tax as a condition of engaging in protected activity, the defendants in those cases imposed a form of prior restraint on speech, rendering the tax highly susceptible to constitutional challenge. *Follett, supra,* at 576–578; *Murdock, supra,* at 112, 113–114; *Jones* v. *Opelika,* 316 U. S. 584, 609, 611 (1942) (Stone, C. J., dissenting), reasoning approved on rehearing in 319 U. S. 103 (1943); see *Grosjean* v. *American Press Co.,* 297 U. S., at 249; see generally *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697 (1931). In that regard, the cases cited by Star Tribune do not resemble a generally applicable sales tax. Indeed, our cases have consistently recognized that nondiscriminatory taxes on the receipts or income of newspapers would be permissible, *Branzburg* v. *Hayes,* 408 U. S. 665, 683 (1972) (dictum); *Grosjean* v. *American Press Co., supra,* at 250 (dictum); cf. *Follett, supra,* at 578 (preacher subject to taxes on income or property) (dictum); *Murdock, supra,* at 112 (same) (dictum).

[10] JUSTICE REHNQUIST's dissent explains that collecting sales taxes on newspapers entails special problems because of the unusual marketing practices for newspapers—sales from vending machines and at newsstands, for instance. *Post,* at 602. The dissent does not, however, explain why the State cannot resolve these problems by using the same methods

cate the sales tax, it is difficult to see why the State did not achieve that goal by the obvious and effective expedient of applying the sales tax.

Further, even assuming that the legislature did have valid reasons for substituting another tax for the sales tax, we are not persuaded that this tax does serve as a substitute. The State asserts that this scheme actually *favors* the press over other businesses, because the same rate of tax is applied, but, for the press, the rate applies to the cost of components rather than to the sales price. We would be hesitant to fashion a rule that automatically allowed the State to single out the press for a different method of taxation as long as the effective burden was no different from that on other taxpayers or the burden on the press was lighter than that on other businesses. One reason for this reluctance is that the very selection of the press for special treatment threatens the press not only with the current *differential* treatment, but also with the possibility of subsequent differentially *more burdensome* treatment. Thus, even without actually imposing an extra burden on the press, the government might be able to achieve censorial effects, for "[t]he threat of sanctions may deter [the] exercise [of First Amendment rights] almost as potently as the actual application of sanctions." *NAACP* v. *Button*, 371 U. S. 415, 433 (1963).[11]

---

used for items like chewing gum and candy, marketed in these same unusual ways and subject to the sales tax, see Minn. Stat. §§ 297A.01 (3)(c)(vi), (viii) (1982) (defining the sale of food from vending machines as a sale); see also § 297A.04 (dealing with vending machine operators).

Further, JUSTICE REHNQUIST fears that the imposition of a sales tax will mean that vending machine prices will be 26¢ instead of 25¢; or prices will be 30¢, with publishers retaining an extra 4¢ per paper; or the price will be 25¢, with publishers absorbing the tax. *Post*, at 602. It is difficult to see how the use tax rectifies this problem, for it increases publishers' costs. If the increase is a penny, the use taxes forces publishers to choose to pass the exact increment along to consumers by raising the price of the finished product to 26¢; or to increase the price by a nickel and retain an extra 4¢ per paper; or to leave the price at 25¢ and absorb the tax.

A second reason to avoid the proposed rule is that courts as institutions are poorly equipped to evaluate with precision the relative burdens of various methods of taxation.[12]   The

[11] JUSTICE REHNQUIST's dissent deprecates this concern, asserting that there is no threat, because this Court will invalidate any differentially more burdensome tax.  *Post*, at 601.   That assertion would provide more security if we could be certain that courts will always prove able to identify differentially more burdensome taxes, a question we explore further, *infra*.

[12] We have not always avoided evaluating the relative burdens of different methods of taxation in certain cases involving state taxation of the Federal Government and those with whom it does business.   See *Washington* v. *United States, ante,* p. 536; *United States* v. *County of Fresno,* 429 U. S. 452 (1977).   Since *McCulloch* v. *Maryland,* 4 Wheat. 316 (1819), the Supremacy Clause has prohibited not only state taxation that discriminates against the Federal Government but also any direct taxation of the Federal Government.   See generally *United States* v. *New Mexico,* 455 U. S. 720, 730–734 (1982).   In spite of the rule against direct taxation of the Federal Government, States remain free to impose the *economic* incidence of a tax on the Federal Government, as long as that tax is not discriminatory. *E. g., id.,* at 734–735, and n. 11; *United States* v. *County of Fresno, supra,* at 460.   In that situation, then, the valid state interest in requiring federal enterprises to bear their share of the tax burden will often justify the use of differential methods of taxation.   As we explained in *Washington* v. *United States,* "[Washington] has merely accommodated for the fact that it may not impose a tax directly on the United States . . . ."   *Ante,* at 546. The special rule prohibiting direct taxation of the Federal Government but permitting the imposition of an equivalent economic burden on the Government may not only justify the State's use of different methods of taxation, but may also force us, within limits, see *Washington, ante,* at 546, n. 11, to compare the burdens of two different taxes.   Nothing, however, prevents the State from taxing the press in the same manner that it taxes other enterprises.   It can achieve its interest in requiring the press to bear its share of the burden by taxing the press as it taxes others, so differential taxation is not necessary to achieve its goals.

JUSTICE WHITE insists that the Court regularly inquires into the economic effect of taxes, relying on a number of cases arising under the Due Process Clause and the Commerce Clause.   In the cases cited, the Court has struck down state taxes only when "[t]he inequality of the . . . tax burden between in-state and out-of-state manufacturer-users [was] admitted," *Halliburton Oil Well Cementing Co.* v. *Reily,* 373 U. S. 64, 70 (1963), and when the Court was able to see that the tax produced a *"grossly* distorted

complexities of factual economic proof always present a certain potential for error, and courts have little familiarity with the process of evaluating the relative economic burden of taxes. In sum, the possibility of error inherent in the proposed rule poses too great a threat to concerns at the heart of the First Amendment, and we cannot tolerate that possibility.[13] Minnesota, therefore, has offered no adequate justification for the special treatment of newspapers.[14]

---

result," *Norfolk & Western R. Co.* v. *Missouri State Tax Comm'n*, 390 U. S. 317, 326 (1968) (emphasis added). In these cases, the Court required the taxpayer to show "gross overreaching," recognizing "the vastness of the State's taxing power and the latitude that the exercise of that power must be given before it encounters constitutional restraints." *Ibid.*; see *Alaska* v. *Arctic Maid*, 366 U. S. 199, 205 (1961). When delicate and cherished First Amendment rights are at stake, however, the constitutional tolerance for error diminishes drastically, and the risk increases that courts will prove unable to apply accurately the more finely tuned standards.

[13] If a State employed the same *method* of taxation but applied a lower *rate* to the press, so that there could be no doubt that the legislature was not singling out the press to bear a more burdensome tax, we would, of course, be in a position to evaluate the relative burdens. And, given the clarity of the relative burdens, as well as the rule that differential methods of taxation are not automatically permissible if less burdensome, a lower tax rate for the press would not raise the threat that the legislature might later impose an extra burden that would escape detection by the courts, see *supra*, at 588, and n. 11. Thus, our decision does not, as the dissent suggests, require Minnesota to impose a greater tax burden on publications.

[14] Disparaging our concern with the complexities of economic proof, JUSTICE REHNQUIST's dissent undertakes to calculate a hypothetical sales tax liability for Star Tribune for the years 1974 and 1975. *Post*, at 597–598. That undertaking, we think, illustrates some of the problems that inhere in any such inquiry, see generally R. Musgrave & P. Musgrave, Public Finance in Theory and Practice 461 (2d ed. 1976) (detailing some of the complexities of calculating the burden of a tax); cf. *id.*, at 475 (in evaluating excess burden of taxes, "quantitative evidence is sketchy and underlying procedures are necessarily crude"). First, the calculation for 1974 and 1975 for this newspaper tells us nothing about the relative impact of the tax on other newspapers or in other years. Since newspapers receive a substantial portion of their revenues from advertising, see generally Newsprint Information

## V

Minnesota's ink and paper tax violates the First Amendment not only because it singles out the press, but also because it targets a small group of newspapers. The effect of the $100,000 exemption enacted in 1974 is that only a handful of publishers pay any tax at all, and even fewer pay any significant amount of tax.[15] The State explains this exemption as part of a policy favoring an "equitable" tax system, although there are no comparable exemptions for small enterprises outside the press. Again, there is no legislative history supporting the State's view of the purpose of the amendment. Whatever the motive of the legislature in this

Committee, Newspaper and Newsprint Facts at a Glance 12 (24th ed. 1982), it is not necessarily true even for profitable newspapers that the price of the finished product will exceed the cost of inputs. Consequently, it is not necessary that a tax imposed on components is less burdensome than a tax at the same rate imposed on the price of the product. Although the relationship of Star Tribune's revenues from circulation and its revenues from advertising may result in a lower tax burden under the use tax in 1974 and 1975, that relationship need not hold for all newspapers or for all time.

Second, if, as the dissent assumes elsewhere, *post,* at 602, the sales tax increases the price, that price increase presumably will cause a decrease in demand. The decrease in demand may lead to lower total revenues and, therefore, to a lower total sales tax burden than that calculated by the dissent. See generally P. Samuelson, Economics 381–383, 389–390 (10th ed. 1976); R. Musgrave & P. Musgrave, Public Finance in Theory and Practice 21 (3d ed. 1980) ("[I]t is necessary, in designing fiscal policies, to allow for how the private sector will respond"). The dissent's calculations, then, can only be characterized as hypothetical. Taking the chance that these calculations or others like them are erroneous is a risk that the First Amendment forbids.

[15] In 1974, 11 publishers paid the tax. Three paid less than $1,000, and another three paid less than $8,000. Star Tribune, one of only two publishers paying more than $100,000, paid $608,634. In 1975, 13 publishers paid the tax. Again, three paid less than $1,000, and four more paid less than $3,000. For that year, Star Tribune paid $636,113 and was again one of only two publishers incurring a liability greater than $100,000. See 314 N. W. 2d, at 203–204, and nn. 4, 5.

case, we think that recognizing a power in the State not only to single out the press but also to tailor the tax so that it singles out a few members of the press presents such a potential for abuse that no interest suggested by Minnesota can justify the scheme. It has asserted no interest other than its desire to have an "equitable" tax system. The current system, it explains, promotes equity because it places the burden on large publications that impose more social costs than do smaller publications and that are more likely to be able to bear the burden of the tax. Even if we were willing to accept the premise that large businesses are more profitable and therefore better able to bear the burden of the tax, the State's commitment to this "equity" is questionable, for the concern has not led the State to grant benefits to small businesses in general.[16] And when the exemption selects such a narrowly defined group to bear the full burden of the tax, the tax begins to resemble more a penalty for a few of the largest newspapers than an attempt to favor struggling smaller enterprises.

## VI

We need not and do not impugn the motives of the Minnesota Legislature in passing the ink and paper tax. Illicit legislative intent is not the *sine qua non* of a violation of the First Amendment. See *NAACP* v. *Button,* 371 U. S., at 439; *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 461 (1958); *Lovell* v. *Griffin,* 303 U. S. 444, 451 (1938). We have long recognized that even regulations aimed at proper governmental concerns can restrict unduly the exercise of rights protected by the First Amendment. *E. g., Schneider* v. *State,* 308 U. S. 147 (1939). A tax that singles out the press, or that targets individual publications within the press, places a

---

[16] Cf. *Mabee* v. *White Plains Publishing Co.,* 327 U. S. 178, 183, 184 (1946) (upholding exemption from Fair Labor Standards Act of small weekly and semiweekly newspapers where the purpose of the exemption was "to put those papers more on a parity with other small town enterprises").

heavy burden on the State to justify its action. Since Minnesota has offered no satisfactory justification for its tax on the use of ink and paper, the tax violates the First Amendment,[17] and the judgment below is

*Reversed.*

JUSTICE WHITE, concurring in part and dissenting in part.

This case is not difficult. The exemption for the first $100,000 of paper and ink limits the burden of the Minnesota tax to only a few papers. This feature alone is sufficient reason to invalidate the Minnesota tax and reverse the judgment of the Minnesota Supreme Court. The Court recognizes that Minnesota's tax violates the First Amendment for this reason, and I subscribe to Part V of the Court's opinion and concur in the judgment.

Having found fully sufficient grounds for decision, the Court need go no further. The question whether Minnesota or another State may impose a use tax on paper and ink that is not targeted on a small group of newspapers could be left for another day.

The Court, however, undertakes the task today. The crux of the issue is whether Minnesota has justified imposing a use tax on paper and ink in lieu of applying its general sales tax to publications. The Court concludes that the State has offered no satisfactory explanation for selecting a substitute for a sales tax. *Ante,* at 587. If this is so, that could be the end of the matter, and the Minnesota tax would be invalid for a second reason.

The Court nevertheless moves on to opine that the State could not impose such a tax even if "the effective burden was no different from that on other taxpayers or the burden on the press was lighter than that on other businesses."

---

[17] This conclusion renders it unnecessary to address Star Tribune's arguments that the $100,000 exemption violates the principles of *Buckley* v. *Valeo,* 424 U. S. 1 (1976), and *Stewart Dry Goods Co.* v. *Lewis,* 294 U. S. 550 (1935).

*Ante*, at 588. The fear is that the government might use the tax as a threatened sanction to achieve a censorial purpose. As JUSTICE REHNQUIST demonstrates, *post*, at 601–602, the proposition that the government threatens the First Amendment by favoring the press is most questionable, but for the sake of argument, I let it pass.

Despite having struck down the tax for three separate reasons, the Court is still not finished. "A second reason" to eschew inquiry into the relative burden of taxation is presented. The Court submits that "courts as institutions are poorly equipped to evaluate with precision the relative burdens of various methods of taxation," *ante*, at 589, except, it seems, in cases involving the sovereign immunity of the United States. Why this is so is not made clear, and I do not agree that the courts are so incompetent to evaluate the burdens of taxation that we must decline the task in this case.

The Court acknowledges that in cases involving state taxation of the Federal Government and those with whom it does business, the Court has compared the burden of two different taxes. *Ante*, at 589, n. 12. See, *e. g.*, *United States* v. *County of Fresno*, 429 U. S. 452 (1977); *United States* v. *City of Detroit*, 355 U. S. 466 (1958). It is not apparent to me why we are able to determine whether a State has imposed the economic incidence of a tax in a discriminatory fashion upon the Federal Government, but incompetent to determine whether a tax imposes discriminatory treatment upon the press. The Court's rationale that these are a unique set of cases which nevertheless "force us" to assume a duty we are incompetent to perform is wholly unsatisfactory. If convinced of its inherent incapacity for tax analysis, the Court could have taken the path chosen today and simply prohibited the States from imposing a compensatory "equivalent" economic burden on those who deal with the Federal Government. It has not done so.

Moreover, the Court frequently has examined—without complaint—the actual effect of a tax in determining whether the State has imposed an impermissible burden on interstate

commerce or run afoul of the Due Process Clause.[1]  In a number of cases concerning railroad taxes, for example, the Court considered the tax burden to decide whether it was the equivalent of a property tax or an invalid tax on interstate commerce.[2]  The Court has compared the burden of use taxes on competing products from sister States with that of sales taxes on products sold in-state to decide whether the former constituted discrimination against interstate commerce.  *Henneford* v. *Silas Mason Co.*, 300 U. S. 577 (1937).[3]  We have also measured tax burdens in our cases considering whether state tax formulas are so out of propor-

---

[1] See, *e. g.*, *Alaska* v. *Arctic Maid*, 366 U. S. 199 (1961) (Alaska occupational tax collected from freezer ships at rate of 4% of value of salmon not discriminatory because Alaskan canneries pay a 6% tax on the value of salmon obtained for canning).

[2] See *Norfolk & Western R. Co.* v. *Missouri State Tax Comm'n*, 390 U. S. 317, 329 (1968) (holding property tax on rolling stock based on a mileage formula violated due process) ("[W]hen a taxpayer comes forward with strong evidence tending to prove that the mileage formula will yield a grossly distorted result in a particular case, the State is obliged to counter that evidence . . ."); *Great Northern R. Co.* v. *Minnesota*, 278 U. S. 503, 509 (1929) ("We find nothing in the record to indicate that the tax under consideration, plus that already collected, exceeds 'what would be legitimate as an ordinary tax on the property valued as part of a going concern, [or is] relatively higher than the taxes on other kinds of property.' *Pullman Co.* v. *Richardson*, 261 U. S. 330, 339"). See also *Pullman Co.* v. *Richardson*, 261 U. S. 330, 339 (1923); *Cudahy Packing Co.* v. *Minnesota*, 246 U. S. 450, 453–455 (1918); *United States Express Co.* v. *Minnesota*, 223 U. S. 335 (1912); *Galveston, H. & S. A. R. Co.* v. *Texas*, 210 U. S. 217 (1908).

[3] In *Henneford*, a 2% tax was imposed on the privilege of using products coming from other States.  Excepted from the tax was any property, the sale or use of which had already been subjected to an equal or greater tax.  The Court, speaking through Justice Cardozo, upheld the use tax, noting that "[w]hen the account is made up, the stranger from afar is subject to no greater burdens as a consequence of ownership than the dweller within the gates."  300 U. S., at 583–584.  See also *Halliburton Oil Well Cementing Co.* v. *Reily*, 373 U. S. 64 (1963) (holding use tax burden went beyond sales tax and constituted invalid discriminatory burden on commerce); *Scripto* v. *Carson*, 362 U. S. 207 (1960) (upholding use tax as complement to sales tax).

tion to the amount of in-state business as to violate due process. See, *e. g.*, *Moorman Mfg. Co.* v. *Bair*, 437 U. S. 267 (1978); *Hans Rees' Sons, Inc.* v. *North Carolina*, 283 U. S. 123 (1931). In sum, the Court's professed inability to determine when a tax poses an *actual* threat to constitutional principles is a novel concept, and one belied by the lessons of our experience.

There may be cases, I recognize, where the Court cannot confidently ascertain whether a differential method of taxation imposes a greater burden upon the press than a generally applicable tax. In these circumstances, I too may be unwilling to entrust freedom of the press to uncertain economic proof. But, as JUSTICE REHNQUIST clearly shows, *post*, at 597–598, this is not such a case. Since it is plainly evident that Minneapolis Star is not disadvantaged and is almost certainly benefited by a use tax vis-à-vis a sales tax, I cannot agree that the First Amendment forbids a State to choose one method of taxation over another.

JUSTICE REHNQUIST, dissenting.

Today we learn from the Court that a State runs afoul of the First Amendment proscription of laws "abridging the freedom of speech, or of the press" where the State structures its taxing system to the advantage of newspapers. This seems very much akin to protecting something so overzealously that in the end it is smothered. While the Court purports to rely on the intent of the "Framers of the First Amendment," I believe it safe to assume that in 1791 "abridge" meant the same thing it means today: to diminish or curtail. Not until the Court's decision in this case, nearly two centuries after adoption of the First Amendment, has it been read to prohibit activities which in no way diminish or curtail the freedoms it protects.

I agree with the Court that the First Amendment does not *per se* prevent the State of Minnesota from regulating the press even though such regulation imposes an economic burden. It is evident from the numerous cases relied on by the

Court, which I need not repeat here, that this principle has been long settled. *Ante*, at 581. I further agree with the Court that application of general sales and use taxes to the press would be sanctioned under this line of cases. *Ante*, at 586–587, n. 9. Therefore, I also agree with the Court to the extent it holds that any constitutional attack on the Minnesota scheme must be aimed at the classifications used in that taxing scheme. *Ante*, at 583. But it is at this point that I part company with my colleagues.

The Court recognizes in several parts of its opinion that the State of Minnesota could avoid constitutional problems by imposing on newspapers the 4% sales tax that it imposes on other retailers. *Ante*, at 586–590, and nn. 9, 13. Rather than impose such a tax, however, the Minnesota Legislature decided to provide newspapers with an exemption from the sales tax and impose a 4% use tax on ink and paper; thus, while both taxes are part of one "system of sales and use taxes," 314 N. W. 2d 201, 203 (1981), newspapers are classified differently within that system.* The problem the Court finds too difficult to deal with is whether this difference in treatment results in a significant burden on newspapers.

The record reveals that in 1974 the Minneapolis Star & Tribune had an average daily circulation of 489,345 copies. *Id.*, at 203–204, nn. 4 and 5. Using the price we were informed of at argument of 25¢ per copy, see Tr. of Oral Arg. 46, gross sales revenue for the year would be $38,168,910. The Sunday circulation for 1974 was 640,756; even assuming that it did not sell for more than the daily paper, gross sales revenue for the year would be at least $8,329,828. Thus, total sales revenues in 1974 would be $46,498,738. Had a 4% sales tax

---

*The sales tax exemption and use tax liability are not, strictly speaking, for newspapers alone. The term of art used in the Minnesota taxing scheme is "publications." Publications is defined to include such materials as magazines, advertising supplements, shoppers guides, house organs, trade and professional journals, and serially issued comic books. See Minn. Stat. § 331.02 (1982); 13 Minn. Code of Agency Rules, Tax S & U 409(b) (1979).

been imposed, the Minneapolis Star & Tribune would have been liable for $1,859,950 in 1974. The same "complexities of factual economic proof" can be analyzed for 1975. Daily circulation was 481,789; at 25¢ per copy, gross sales revenue for the year would be $37,579,542. The Sunday circulation for 1975 was 619,154; at 25¢ per copy, gross sales revenue for the year would be $8,049,002. Total sales revenues in 1975 would be $45,628,544; at a 4% rate, the sales tax for 1975 would be $1,825,142. Therefore, had the sales tax been imposed, as the Court agrees would have been permissible, the Minneapolis Star & Tribune's liability for 1974 and 1975 would have been $3,685,092.

The record further indicates that the Minneapolis Star & Tribune paid $608,634 in use taxes in 1974 and $636,113 in 1975—a total liability of $1,244,747. See 314 N. W. 2d, at 203–204, nn. 4 and 5. We need no expert testimony from modern day Euclids or Einsteins to determine that the $1,224,747 paid in use taxes is significantly less burdensome than the $3,685,092 that could have been levied by a sales tax. *A fortiori*, the Minnesota taxing scheme which singles out newspapers for "differential treatment" has benefited, not burdened, the "freedom of speech, [and] of the press."

Ignoring these calculations, the Court concludes that "differential treatment" alone in Minnesota's sales and use tax scheme requires that the statutes be found "presumptively unconstitutional" and declared invalid "unless the State asserts a counterbalancing interest of compelling importance that it cannot achieve without differential taxation." *Ante,* at 585. The "differential treatment" standard that the Court has conjured up is unprecedented and unwarranted. To my knowledge this Court has never subjected governmental action to the most stringent constitutional review solely on the basis of "differential treatment" of particular groups. The case relied on by the Court, *Police Department of Chicago* v. *Mosley,* 408 U. S. 92, 95–96 (1972), certainly does not stand for this proposition. In *Mosley* all picketing except "peaceful picketing" was prohibited within a particular public area.

Thus, "differential treatment" was not the key to the Court's decision; rather the essential fact was that unless a person was considered a "peaceful picketer" his speech through this form of expression would be totally abridged within the area.

Of course, all governmentally created classifications must have some "rational basis." See *Williamson* v. *Lee Optical Co.*, 348 U. S. 483 (1955); *Railway Express Agency, Inc.* v. *New York*, 336 U. S. 106 (1949). The fact that they have been enacted by a presumptively rational legislature, however, arms them with a presumption of rationality. We have shown the greatest deference to state legislatures in devising their taxing schemes. As we said in *Allied Stores of Ohio, Inc.* v. *Bowers*, 358 U. S. 522 (1959):

> "The States have a very wide discretion in the laying of their taxes. When dealing with their proper domestic concerns, and not trenching upon the prerogatives of the National Government or violating the guaranties of the Federal Constitution, the States have the attribute of sovereign powers in devising their fiscal systems to ensure revenue and foster their local interests. . . . The State may impose different specific taxes upon different trades and professions and may vary the rate of excise upon various products. It is not required to resort to close distinctions or to maintain a precise, scientific uniformity with reference to composition, use or value. [Citations omitted.] 'To hold otherwise would be to subject the essential taxing power of the State to an intolerable supervision, hostile to the basic principles of our Government . . . .'" *Id.*, at 526–527 (quoting *Ohio Oil Co.* v. *Conway*, 281 U. S. 146, 159 (1930)).

See also *Kahn* v. *Shevin*, 416 U. S. 351 (1974); *Independent Warehouses, Inc.* v. *Scheele*, 331 U. S. 70 (1947); *Madden* v. *Kentucky*, 309 U. S. 83 (1940); *Fox* v. *Standard Oil Co. of New Jersey*, 294 U. S. 87 (1935); *New York Rapid Transit Corp.* v. *City of New York*, 303 U. S. 573 (1938).

Where the State devises classifications that infringe on the fundamental guarantees protected by the Constitution the Court has demanded more of the State in justifying its action. But there is no *infringement*, and thus the Court has never required more, unless the State's classifications *significantly burden* these specially protected rights. As we said in *Massachusetts Board of Retirement* v. *Murgia*, 427 U. S. 307, 312 (1976) *(per curiam)* (emphasis added), "equal protection analysis requires strict scrutiny of a legislative classification only when the classification *impermissibly interferes* with the exercise of a fundamental right. . . ." See also *California Medical Assn.* v. *FEC*, 453 U. S. 182 (1981); *Maher* v. *Roe*, 432 U. S. 464 (1977); *Storer* v. *Brown*, 415 U. S. 724 (1974); *American Party of Texas* v. *White*, 415 U. S. 767 (1974); *San Antonio Independent School District* v. *Rodriguez*, 411 U. S. 1 (1973). To state it in terms of the freedoms at issue here, no First Amendment issue is raised unless First Amendment rights have been infringed; for if there has been no infringement, then there has been no "abridgment" of those guarantees. See *Branzburg* v. *Hayes*, 408 U. S. 665 (1972).

Today the Court departs from this rule, refusing to look at the record and determine whether the classifications in the Minnesota use and sales tax statutes significantly burden the First Amendment rights of appellant and its fellow newspapers. The Court offers as an explanation for this failure the self-reproaching conclusion that

> "courts as institutions are poorly equipped to evaluate with precision the relative burdens of various methods of taxation. The complexities of factual economic proof always present a certain potential for error, and courts have little familiarity with the process of evaluating the relative economic burden of taxes. In sum, the possibility of error inherent in the proposed rule poses too great a threat to concerns at the heart of the First Amendment, and we cannot tolerate that possibility. Minne-

sota, therefore, has offered no adequate justification for the special treatment of newspapers." *Ante*, at 589–590 (footnotes omitted).

Considering the complexity of issues this Court resolves each Term, this admonition as a general rule is difficult to understand. Considering the specifics of this case, this confession of inability is incomprehensible.

Wisely not relying solely on its inability to weigh the burdens of the Minnesota tax scheme, the Court also says that even if the resultant burden on the press is lighter than on others

> "the very selection of the press for special treatment threatens the press not only with the current *differential* treatment, but also with the possibility of subsequent differentially *more burdensome* treatment. Thus, even without actually imposing an extra burden on the press, the government might be able to achieve censorial effects, for '[t]he threat of sanctions may deter [the] exercise [of First Amendment rights] almost as potently as the actual application of sanctions.'" *Ante*, at 588.

Surely the Court does not mean what it seems to say. The Court should be well aware from its discussion of *Grosjean* v. *American Press Co.*, 297 U. S. 233 (1936), that this Court is quite capable of dealing with changes in state taxing laws which are intended to penalize newspapers. As Justice Holmes aptly put it: "[T]his Court which so often has defeated the attempt to tax in certain ways can defeat an attempt to discriminate or otherwise go too far without wholly abolishing the power to tax. The power to tax is not the power to destroy while this Court sits." *Panhandle Oil Co.* v. *Knox*, 277 U. S. 218, 223 (1928) (dissenting opinion). Furthermore, the Court itself intimates that if the State had employed "the same *method* of taxation but applied a lower *rate* to the press, so that there could be no doubt that the legislature was not singling out the press to bear a more burden-

some tax" the taxing scheme would be constitutionally permissible. *Ante*, at 590, n. 13. This obviously has the same potential for "the threat of sanctions," because the legislature could at any time raise the taxes to the higher rate. Likewise, the newspapers' absolute exemption from the sales tax, which the Court acknowledges is used by many other States, would be subject to the same attack; the exemption could be taken away.

The State is required to show that its taxing scheme is rational. But in this case that showing can be made easily. The Court states that "[t]he court below speculated that the State might have been concerned that collection of a [sales] tax on such small transactions would be impractical." *Ante*, at 587. But the Court finds this argument "unpersuasive," because "sales of other low-priced goods" are subject to the sales tax. *Ibid.* I disagree. There must be few such inexpensive items sold in Minnesota in the volume of newspaper sales. Minneapolis Star & Tribune alone, as noted above, sold approximately 489,345 papers every weekday in 1974 and sold another 640,756 papers every Sunday. In 1975 it had a daily circulation of 481,789 and a Sunday circulation of 619,154. Further, newspapers are commonly sold in a different way than other goods. The legislature could have concluded that paperboys, corner newsstands, and vending machines provide an unreliable and unsuitable means for collection of a sales tax. Must everyone buying a paper put 26¢ in the vending machine rather than 25¢; or should the price of a paper be raised to 30¢, giving the paper 4¢ more profit; or should the price be kept at 25¢ with the paper absorbing the tax? In summary, so long as the State can find another way to collect revenue from the newspapers, imposing a sales tax on newspapers would be to no one's advantage; not the newspaper and its distributors who would have to collect the tax, not the State who would have to enforce collection, and not the consumer who would have to pay for the paper in odd amounts. The reasonable alternative Minnesota chose was to impose the use tax on ink and paper. "There is no reason

to believe that this legislative choice is insufficiently tailored to achieve the goal of raising revenue or that it burdens the first amendment in any way whatsoever." 314 N. W. 2d, at 207. Cf. *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U. S. 456 (1981).

The Court finds in very summary fashion that the exemption newspapers receive for the first $100,000 of ink and paper used also violates the First Amendment because the result is that only a few of the newspapers actually pay a use tax. I cannot agree. As explained by the Minnesota Supreme Court, the exemption is in effect a $4,000 credit which benefits all newspapers. 314 N. W. 2d, at 203. Minneapolis Star & Tribune was benefited to the amount of $16,000 in the two years in question; $4,000 each year for its morning paper and $4,000 each year for its evening paper. *Ibid.* Absent any improper motive on the part of the Minnesota Legislature in drawing the limits of this exemption, it cannot be construed as violating the First Amendment. See *Oklahoma Press Publishing Co.* v. *Walling*, 327 U. S. 186, 194 (1946). Cf. *Mabee* v. *White Plains Publishing Co.*, 327 U. S. 178 (1946). The Minnesota Supreme Court specifically found that the exemption was not a "deliberate and calculated device" designed with an illicit purpose. 314 N. W. 2d, at 208. There is nothing in the record which would cast doubt on this conclusion. The Minnesota court further explained:

"[I]t is necessary for the legislature to construct economically sound taxes in order to raise revenue. In order to do so, the legislature must classify or grant exemptions to insure that the burden upon the taxpayer in paying the tax or upon the state in collecting the tax does not outweigh the benefit of the revenues to the state. 'Traditionally classification has been a device for fitting tax programs to local needs and usages in order to achieve an equitable distribution of the tax burden.' *Madden* v. *Kentucky*, 309 U. S. 83, 88 (1940)." *Id.*, at 209–210.

There is no reason to conclude that the State, in drafting the $4,000 credit, acted other than reasonably and rationally to fit its sales and use tax scheme to its own local needs and usages.

To collect from newspapers their fair share of taxes under the sales and use tax scheme and at the same time avoid abridging the freedoms of speech and press, the Court holds today that Minnesota must subject newspapers to millions of additional dollars in sales tax liability. Certainly this is a hollow victory for the newspapers, and I seriously doubt the Court's conclusion that this result would have been intended by the "Framers of the First Amendment."

For the reasons set forth above, I would affirm the judgment of the Minnesota Supreme Court.