Mary MOORE, et al., Plaintiffs,

v.

Dan MORALES, et al., Defendants.

Civ. A. No. H–93–2170.

United States District Court,
S.D. Texas,
Houston Division.

Jan. 19, 1994.

Neil H. Cogan, Dallas, TX, for all named plaintiffs.

Michael F. Linz, Frank D. Chandler, Dallas, TX, for Direct Mail Marketing, Inc. and John Heather.

Kenneth R. Poland, The Woodlands, TX, for Mary Moore, Paul Weinstein, Archie Henderson, B.J. Hooks, H. Wayne Bettis, Jack P. Lee, John G. Miller, Jr., Craig W. Uhran, Earnest O. Hopmann, III.

John J. Harvey, Jr., Arlington, TX, for Innovative Database Systems, Nat. Ass'n of Acc. Injury Victims, Timothy Rusk, Steve Livens, Lois Livens, and Livens & Livens, P.C.

Martyn B. Hill, Kent J. Pagel, Houston, TX, for Adriene Anderson Courier Service, Inc.

David H. Donaldson, Jr., Peter D. Kennedy, Austin, TX, for David O. Chambers, Paul J. Dunham, Raymond King, Steven P. Boney, S. Aldous Strauch, Jeffrey R. Casey, John Venture and Bruch Thrasher

Dedra L. Wilburn, Austin, for Atty. Gen. Dan Morales and Colonel James R. Wilson, Director of TX Dept. of Public Safety.

Sharon McCally, Houston, TX, Richard C. Hile, Jasper, TX, for Atty. Gen. Dan Morales.

Jack Banner, Wichita Falls, TX, for Barry Macha, Dist. Atty., Wichita County.

Gregory Jones, for Jose Rubio, Jr., Dist. Atty., Webb County.

William J. Delmore, III, Houston, TX, for John B. Holmes, Dist. Atty., Harris County.

Barry Abrams, Houston, TX, for all defendant Police Chiefs.

## ORDER

HITTNER, District Judge.

Pending before the Court are the Motions for Preliminary and Permanent Injunction filed by plaintiffs in the above referenced cause. Having considered the motions, the submissions, and the testimony presented in a trial on the merits conducted by the Court on November 8 through 12, 1993, the Court determines that the motions should be granted.

Plaintiffs include various commercial entities that obtain accident reports and criminal offense reports from public agencies, such as police departments and the Texas Department of Public Safety, and disseminate that information for a fee. Plaintiffs also include licensed attorneys practicing in the State of Texas who utilize accident and criminal offense reports to solicit clients through direct mail advertising. Plaintiffs brought this action seeking a permanent injunction against enforcement of recent amendments to chapter 38 of the Texas Penal Code ("the Barratry Statute") and to the Texas Uniform Act Regulating Traffic on Highways ("the Uniform Traffic Act"). Specifically, plaintiffs contend enforcement of TEX.PENAL CODE ANN. §§ 38.12(d)(2)(A), (B), (C), & (D) and 38.12(e), and TEX.REV.CIV.STAT.ANN. art. 6701d § 47(a), (b), (c), (f), all effective September 1, 1993, would violate their constitutional rights pursuant to the First and Fourteenth Amendments to the United States Constitution.

This Court initially entered a Temporary Restraining Order against enforcement of the amendments to the Barratry Statute and the Uniform Traffic Act on August 31, 1993. By agreement of the parties, the Court extended the Temporary Restraining Order until the Court's decision after a trial on the merits. The parties also agreed that only certain defendants, Texas Attorney General Dan Morales, Director of the Texas Department of Public Safety Colonel James R. Wilson, Webb County District Attorney Jose Rubio, Jr., and Wichita County District Attorney Barry Macha, would actively participate in the trial. All the defendants agreed to be bound by this Court's decision.

Barratry refers to "the offense of ... exciting and stirring up quarrels and suits, either at law or otherwise."[1] During the 1993 Regular Session, the Texas Legislature amended the Texas Barratry Statute. These amendments were the legislators' second attempt to restrict barratry in the State of Texas. In 1991, the 72nd Legislature passed House Bill 922, amending Section 35.54 of the TEX.BUS. & COM.CODE ANN., and Senate Bill 857, amending Article 4512b of the TEX. REV.CIV.STAT.ANN. House Bill 922 completely prohibited the use of crime or motor vehicle accident victim information for the purpose of soliciting business and the sale of such information to another person for financial gain. Senate Bill 857 permitted the Board of Chiropractic Examiners to reprimand a licensee for soliciting potential patients who had recently been involved in either a motor vehicle or work-related accident. The State of Texas argued that the prohibitions imposed by House Bill 922 and Senate Bill 857 promoted ethical standards necessary for licensed professionals, particularly in the legal profession. Further, the State argued that the restrictions were intended to prevent fraud and misrepresentation by these professionals. Finally, the State argued that it had a substantial interest in protecting the public from inflated insurance rates.[2] *Innovative Database Systems, et al. v. Morales,* 990 F.2d 217, 221 (5th Cir.1993). These bills were held to be unconstitutional by the district court, which was

---

1. BLACK'S LAW DICTIONARY 137 (6th ed. 1990).

2. In the instant case, the State of Texas is not advancing the position of protecting individuals from unnecessarily inflated insurance rates in amending the Barratry Statute and the Uniform Traffic Act.

affirmed by the Fifth Circuit, because the "outright ban" was "too broad a means of effectuating the intended purpose of the law." *Id.* at 222.

The amendments to the Barratry Statute that plaintiffs are currently challenging prohibit "attorneys, chiropractors, physicians, surgeons, private investigators licensed to practice in this state or any person licensed, certified, or registered by a health care regulatory agency of this state . . ." from sending any written communications to targeted potential clients with the intent of obtaining professional employment within thirty days of an accident, criminal arrest, or the filing of a civil lawsuit.[3] TEX.PENAL CODE ANN. § 38.-12(b)(1) (Vernon Supp.1994).

The Texas Legislature passed House Bill 272, amending the Uniform Traffic Act, which prohibits the release of accident reports for 180 days from the date of the accident. TEX.CIV.STAT.ANN. art. 6701d, § 45(a) (Vernon Supp.1994). The amendments to the Uniform Traffic Act do afford, however, an opportunity for designated classes of people, including insurance agencies and the news media, to obtain such accident reports within 180 days of an accident. The Uniform Traffic Act acts in concert with the Barratry Statute. The amended Barratry Statute provides that accident reports "must include a means of designating whether an individual involved in an accident does or does not desire to be contacted by persons seeking professional employment. . . ." TEX.PENAL CODE ANN. § 38.12(e). The Uniform Traffic Act provides that ". . . [t]he [accident report] forms must include a means of designating whether an individual involved in an accident does not desire to be contacted by persons seeking to obtain professional employment as a professional described by Section 38.12(b)(1), Penal Code." TEX.REV.CIV.STAT.ANN. § 6701d § 45(a).

The Supreme Court has held that states may regulate speech that is false, misleading, deceptive or related to an unlawful activity. *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n. of New York,* 447 U.S. 557, 563, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980). However, if a state chooses to regulate speech, it has the burden of proving that the restrictions are justified. *Edenfield v. Fane,* —— U.S. ——, ——, 113 S.Ct. 1792, 1800, 123 L.Ed.2d 543 (1992). In restricting commercial speech, states are not required to employ "least restrictive means" as is required for other forms of protected speech. *Board of Trustees of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 476, 109 S.Ct. 3028, 3032, 106 L.Ed.2d 388 (1989). However, the Supreme Court has also stated that in regulating truthful, commercial speech, the State must prove that its interests in proscribing that speech are substantial, that the regulations advance these interests in a direct and material manner, and that the magnitude of the restriction is proportionate to the State's interests in the regulation. *Edenfield,* —— U.S. at ——, 113 S.Ct. at 1800; *see also Shapero v. Kentucky Bar Ass'n,* 486 U.S. 466, 486, 108 S.Ct. 1916, 1928, 100 L.Ed.2d 475 (1988) (stating that "[c]ommercial speech that is not false or deceptive and does not concern unlawful activities . . . may be restricted only in the service of substantial government interest, and only through means that directly advance that interest.").

In amending the Barratry Statute and the Uniform Traffic Act, the State of Texas imposed restrictions on commercial speech. In reference to the Barratry Statute, the Legislature directly limits when certain classes of individuals may solicit employment. The amendments to the Uniform Traffic Act impact commercial speech indirectly. By limiting access to the accident reports for 180 days after an accident, to certain classes of individuals, the State is, in effect, thwarting the means by which solicitation is conducted. In its pleadings filed in this case, the State articulated the following interests as those which are directly advanced by the regulations:

> (1) protecting the citizens of Texas from uninvited solicitation letters from attorneys, chiropractors, and other licensed professionals during the thirty-day period when the citizen's judgment may be impaired due to emotional distress;

---

**3.** The Texas Medical Association did not appear as a party to this lawsuit, nor were physicians represented in any capacity. Private investigators also did not appear as parties to the suit.

(2) protecting the citizens of the State of Texas from the emotional distress caused by the receipt of unwanted solicitation letters, telephone calls, and in-person visits from attorneys, chiropractors, and other licensed professionals following an accident;[4]

(3) protecting the citizens of the State of Texas from false, misleading, and/or deceptive solicitation letters and from telephonic and in-person solicitation;

(4) protecting the privacy of citizens of the State of Texas; and

(5) maintaining and promoting standards of ethical conduct and public confidence in attorneys, chiropractors, and other licensed professionals in the State of Texas.

In order for these regulations to withstand the constitutional scrutiny mandated by the United States Supreme Court, the defendants bear the burden of proving that these interests are substantial state interests, that the State's interest is directly advanced by the regulations and that there is a reasonable fit between the State's interest and the regulation. *Fox,* 492 U.S. at 480, 109 S.Ct. at 3034; *Central Hudson,* 447 U.S. at 564, 100 S.Ct. at 2350. In this case, each of the interests articulated by the State of Texas, in amending the statutes, has been addressed by the Supreme Court and rejected as not comprising a "substantial state interest."

The challenged regulations are intended to protect Texans from uninvited solicitation letters from attorneys, chiropractors, and other licensed professionals during the thirty-day period when the citizen's judgment may be impaired due to emotional distress and to protect individuals from the emotional distress associated with receiving a solicitation letter. The Supreme Court has specifically addressed the issue of protecting individuals during times of emotional distress. In *Shapero v. Kentucky Bar Association,* the Court stated that the relevant inquiry in determining whether the State's interests are substantial is not "whether there exist potential clients whose 'condition' makes them more susceptible to undue influence, but whether the mode of the communication poses a serious danger that lawyers will exploit such susceptibility." *Shapero v. Kentucky Bar Ass'n,* 486 U.S. 466, 474, 108 S.Ct. 1916, 1922, 100 L.Ed.2d 475 (1988).

The defendants contend that the *Shapero* case is distinguishable from the present case because *Shapero* involved direct mail solicitation to potential clients involved in foreclosure suits. The defendants argue that a solicitation letter, like the one involved in the *Shapero* case, can easily be put aside and not emotionally upset the person receiving it. They contend that a solicitation letter to an accident victim or to a relative of an accident victim could not be as easily set aside as a foreclosure letter because that person would not be thinking clearly or might feel compelled to open all mail from an attorney not knowing if the letter contained important information.[5] However, the Supreme Court in the *Shapero* case did not limit the holding of the case to the specific facts of receiving a foreclosure letter as opposed to a letter directed to an accident victim. The case clearly holds that states may not regulate commercial speech merely because a recipient of that speech might be emotionally distressed. *Shapero,* 486 U.S. at 473, 108 S.Ct. at 1921.

Defendants' expert witness, Richard Lazarus, Ph.D., testified that individuals may suffer from post-traumatic shock disorder for at least six to eight weeks after a traumatic event. These individuals may suffer from impaired decision-making abilities, stress, feelings of confusion and avoidance, denial, guilt, and emotional flatness. Dr. Lazarus explained that the receipt of solicitation mail may exacerbate these feelings within individuals. Thus, although the thirty-day limit might alleviate the possibility of this occurrence, in Dr. Lazarus' opinion a longer time to shield individuals would be necessary.

Defendants' expert witness, Karl Slaikeu Ph.D., testified that a traumatic experience

---

4. The plaintiffs in this case are not challenging the sections of the Barratry Statute which criminalize in-person or telephone solicitation.

5. The proposed, but defeated amendments to the Texas Disciplinary Rules of Professional Conduct would have required the word "advertisement" to appear on the envelope of all direct-mail solicitation by attorneys. *See* discussion *infra.*

may cast a person into a crisis state which involves difficulty coping with decision making, problem solving, and general turbulence. In Dr. Slaikeu's opinion, this crisis time also lasts a minimum of six to eight weeks. Receiving a solicitation letter would add to the crisis situation from which the individual was suffering. Dr. Slaikeu testified that the thirty-day period is only half of the time a person would need to be sheltered from solicitation letters.

Both defense expert witnesses testified that the receipt of a solicitation letter may add to the accident victim's feelings of trauma and crisis. However, the Supreme Court has clearly stated that merely because an individual is potentially more susceptible to undue influence or poor decision-making skills, does not warrant state regulation of truthful, non-deceptive speech. See Shapero, 486 U.S. at 474, 108 S.Ct. at 1922. The focus is on whether the sender of the solicitation will exploit this potential vulnerability. Id.

The defendants presented no evidence indicating that individuals soliciting clients through direct mail contact do so in order to take advantage of those people suffering from post-traumatic shock or who are in a crisis state. The plaintiffs' evidence at trial demonstrated that direct mail solicitation is targeted at those people who are believed to be in need of certain services and is not targeted at these individuals because they are in a position of weakness.

The State has additionally failed to show that restricting direct mail solicitation directly advances the State's concern for the emotional well-being of the public or that there is a reasonable fit between the State's interest and the regulations. The defendants' experts stated that the desired time within which no contact should take place is six to eight weeks. The Barratry Statute prohibits mail solicitation within thirty days of an accident, arrest, or filing of a civil lawsuit. Although the defendants' expert witnesses both testified that the six to eight week time period would be a sufficient recovery time, the State did not show that *thirty days* would substantially advance the State's interest of protecting the emotional well-being of accident victims in any meaningful way. The

mere possibility that thirty days might serve some emotional benefit to certain individuals does not substantially advance the State interest. See Shapero, 486 U.S. at 473, 108 S.Ct. at 1921.

The State of Texas also articulated the interest of protecting its citizens from the emotional distress of receiving unwanted telephone calls and in-person visits. The Court does not reach this issue as the plaintiffs do not challenge the sections of the Barratry Statute that prohibit in-person and telephonic contact.

The amendments are intended to protect individuals from false, misleading, and/or deceptive solicitation. The plaintiffs acknowledge that commercial speech that is false, misleading, or deceptive may be subjected to a total ban. *Edenfield*, —— U.S. at ——, 113 S.Ct. at 1799. The defendants concede that all the plaintiffs, other than Innovative Database Systems ("IDS") and the National Association of Accident Injury Victims ("NAAIV"), engage in truthful, non-deceptive advertising.

John Bechtel ("Bechtel"), one of the plaintiffs in this case, testified that he is the founder of IDS and the NAAIV. The NAAIV, although labeled as an association of *accident and injury victims,* is comprised *only* of chiropractors who pay monthly dues of $850.00 to $1800.00 to belong. Bechtel testified that there is not one accident or injury victim associated with the NAAIV. The NAAIV purports to be an association which advances the rights of those involved in accidents and disseminates information to these individuals. The NAAIV does not inform the public it is funded solely by chiropractors unless asked. The NAAIV also publishes an Accident Advisor Newsletter which purports to serve as an informative medium for accident victims. Defendants contend that the NAAIV is not a legitimate organization but one whose entire purpose is to solicit business for chiropractors from accident victims.

Attorney Tom Edwards ("Edwards"), a witness for the defendants, testified regarding another potential form of deception and abuse that arises from direct mail solicita-

tion. Edwards testified that he was personally aware of attorneys sending letters to potential clients in divorce cases advising them to avoid service of process and to hide assets. The sentiment among many is that lawyers engaged in this type of misconduct are a disgrace to the legal profession.[6] However, the Supreme Court has stated that "merely because targeted, direct mail solicitation presents lawyers with opportunities for isolated abuses or mistakes does not justify a total ban on that mode of protected commercial speech." *Shapero,* 486 U.S. at 476, 108 S.Ct. at 1923. Rather, the State may implement narrower regulations to limit the potential for misleading solicitation. The Supreme Court in *Shapero* suggested requiring lawyers to file any solicitation letter with a state agency "giving the state an opportunity to supervise mailings and penalize actual abuses." *Shapero,* 486 U.S. at 477, 108 S.Ct. at 1923. The thirty day ban does not address the problem of misleading or deceptive communication. The NAAIV and organizations like it may continue to deceptively solicit business after the thirty day period. Therefore, the regulations do not reasonably relate to the goal of protecting the public from deceptive communication. Similarly, the 180–day restriction on access to accident reports is not reasonably related to preventing misleading or deceptive solicitation because any communications sent after individuals gain access to accident reports may still be deceptive. Therefore, the State's purported purpose in preventing false or misleading speech is not being served by the time limits because deceptive communications may still be sent after the expiration of these time limits.

The regulations in question are also overly broad. The Supreme Court has stated that "[s]ince state regulation of commercial speech 'may extend only as far as the interest it serves' . . . state rules that are designed to prevent the 'potential for deception and confusion . . . may be no broader than reasonably necessary to prevent the' perceived evil." *Shapero,* 486 U.S. at 474, 108 S.Ct. at 1922 (citing *Central Hudson,* 447 U.S. at 565, 100 S.Ct. at 2350 and *In re*

*R.M.J.,* 455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982)). It was recently held that a Florida State Bar Rule prohibiting direct mail solicitation within thirty days of an accident was unconstitutional. *McHenry v. The Florida Bar,* 808 F.Supp. 1543, 1547 (M.D.Fla.1992) *appeal filed, Florida State Bar v. McHenry,* No. 93–2069 (11th Cir. 1993). In that case, the district court held that the Florida State Bar's articulated interest in protecting the public from misleading direct mail communication was not substantially advanced by a narrowly tailored regulation because misleading solicitations could still be sent after thirty days. *Id.* Similarly, this Court finds that the State of Texas' articulated interest of protecting the public from false or misleading communications is not substantially advanced by the amendments to the Barratry Statute or the Uniform Traffic Act.

The fourth interest the State of Texas articulated in amending the Barratry Statute and the Uniform Traffic Act is protecting the privacy of its citizens. The issue of protecting individual privacy rights from direct mail solicitation has been addressed by the Supreme Court. In *Shapero,* the Court stated that "the invasion, if any, occurs when the lawyer discovers the recipient's legal affairs, not when he confronts the recipient with the discovery." *Shapero,* 486 U.S. at 477, 108 S.Ct. at 1923. The amendments to the Uniform Traffic Act prohibit the release of auto accident reports for 180 days from the date of an accident. However, the amendments provide exceptions to the 180–day prohibition whereby certain classes of people, including insurance company agents and the news media, may obtain the accident reports within 180 days. Therefore, any invasion of privacy occurs when the information relating to the accident is released. As the Supreme Court stated, the invasion does not occur when the solicitation is sent but rather when the private information is discovered. *Id.* The regulations are not reasonably related to the interest of protecting the privacy rights of individuals because the information may be publicly discovered and disseminated by the media and insurance companies.

**6.** *See* Mark Hansen, *Texas Makes Solicitation a*   *Felony,* 79 A.B.A.J. 32, 32 (September 1993).

The defendants' witnesses at trial, Joanne Lykins and George Miller, both testified about their experiences with direct mail solicitation after close family members were killed in vehicle accidents. These witnesses testified that they suffered emotional distress not only from receiving solicitation letters but also from media coverage of the accidents and from in-person visits by insurance company representatives in their homes and in the hospital within hours after the accidents. Therefore, limiting access to accident reports pursuant to the amendments to the Uniform Traffic Act does not reasonably relate to the interest of protecting the privacy rights of individuals when the information can be obtained and disseminated by the media and insurance companies.

The defendants contend that the privacy interest extends to individuals criminally charged who should not have to face the embarrassment of receiving direct mail solicitation after an arrest. However, the facts of an arrest and criminal charges are public records. Therefore, these individuals have no privacy interest concerning the release of this information. Likewise, this analysis applies to civil lawsuits wherein the filing of the action is also matter of public record.

Finally, the state has articulated the interest of maintaining and promoting standards of ethical conduct and public confidence in attorneys, chiropractors, and other licensed professionals in the State of Texas. The Supreme Court has rejected the concept that allowing attorney advertising undermines ethical conduct in the profession. *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). Solicitation by mail is a form of advertising granted First Amendment protection. *Id.* at 363, 97 S.Ct. at 2698.[7]

The defendants also argue that the amendments to the Barratry Statute and the Uniform Traffic Act are legitimate time, place, or manner restrictions on commercial speech. In order for a restriction to be a legitimate time, place, or manner regulation, it must be content-neutral and not favor one type of speech over another. Where the goal is to suppress certain speech in favor of other speech, such a goal is presumptively unconstitutional. *Minneapolis Star & Tribune v. Minn. Comm'r of Rev,* 460 U.S. 575, 585, 103 S.Ct. 1365, 1371, 75 L.Ed.2d 295 (1983). If the time, place, or manner restriction favors one type of speech over the other, the State must justify the disparate treatment with an overriding government interest. *City of Cincinnati v. Discovery Network, Inc.,* — U.S. —, —, 113 S.Ct. 1505, 1510, 123 L.Ed.2d 99 (1993). The Barratry Statute and the Uniform Traffic Act operate to suppress the commercial speech of certain classes of citizens while favoring the speech of others by exempting them from the restrictions.

The Barratry Statute only restricts direct mail solicitation by attorneys, chiropractors, physicians, surgeons, private investigators, or any person licensed by a health care regulatory agency of the State. All other classes of citizens are not prohibited from soliciting within thirty days of an accident, arrest, or the filing of a criminal lawsuit. The defendants' evidence did not justify treating those targeted by these amendments differently from, for example, insurance companies, body shops, funeral homes, bail bondsmen, or others whose services might be appropriate by reason of the accident, arrest, or lawsuit.

Prior to the amendments to the Uniform Traffic Act, accident reports were public records pursuant to the Texas Open Record Act. The denial of access to accident records effectuates a significant restriction on the ability of the plaintiffs to communicate with potential clients. A state cannot avoid the restraints of the First Amendment by choosing an indirect method of suppressing speech. *See Minneapolis Star & Tribune,* 460 U.S. at 592, 103 S.Ct. at 1375. Pursuant to the Uniform Traffic Act, the State of Texas has chosen an indirect method of preventing solicitation by prohibiting access to the information. Because this implicates the First Amendment, the State is required to justify

---

7. *See* Richard Sanders, *Lawyer Advertising and Solicitation: the Good, the Bad, the Unethical,* 50 Or.St.B.Bull. 5 (1990) (noting that lawyer solicitation and advertising present obvious problems for those concerned with professionalism because they are commercial speech and are therefore afforded constitutional protection).

the restriction. The Supreme Court has recently held that states may not enact a law which is arguably neutral on its face if it has a disproportionate impact on First Amendment rights and the intent of the government body enacting the regulation was to suppress those rights. *Church of Lukumi Babalu Aye v. City of Hialeah,* —— U.S. ——, —— – ——, 113 S.Ct. 2217, 2227–28, 124 L.Ed.2d 472 (1993) (holding that a city council's decision to ban the ritualistic slaughter of animals, although neutral on its face, violated the First Amendment rights of the plaintiff because it disproportionately impacted on their rights and because the City conceded that the law was enacted to prevent the plaintiffs from establishing a church in their municipality).

The State of Texas admits that its intent in amending the Uniform Traffic Act was to restrict this direct-mail solicitation. On the other hand, insurance companies and the general media, among others, have immediate access to these accident reports to continue their speech related activities while denying access to the plaintiffs. The State has not met its burden of justifying the favoring of insurance companies, the media, and others over attorneys, chiropractors, other health care professionals, and private investigators. *See id.*

The Texas Legislature, in amending the Barratry Statute and the Uniform Traffic Act, expressed its concern about the ever-increasing number of professionals engaged in barratry. The amendments reflect a desire by the Legislature to eradicate the negative effects of barratry. The sentiment has been expressed, by attorneys themselves, that "... lawyer advertising has been devastating to the image of ... [the] profession ... [and that] it's the single most contributing cause of the negative image people have of lawyers."[8] Outrageous examples of lawyer solicitation and advertising exacerbate the negative image associated with lawyers.[9] Images of sleazy attorneys at the scene of an accident feigning concern in order to prey on the weakness of the distraught "casts a blemish" on the entire legal profession.[10] Similarly, media coverage of victims of disasters and their families being bombarded by letters and phone calls from attorneys within hours of an accident contributes to the public perception of lawyers as greedy ambulance chasers[11] and even as "licensed predators."[12]

Many of the problems associated with barratry may stem from an alleged overabundance of attorneys. Some contend that the market cannot adequately provide employment for the numbers of attorneys that the law schools are producing.[13] Plaintiffs' witness, attorney Tim Rusk ("Rusk"), testified that he worked part time at a grocery store to support himself for approximately ten months after graduation from Texas Tech Law School. It was not until he began direct mail solicitation to individuals who had received traffic tickets that he could support himself as an attorney. Rusk testified that ninety-five percent of his income is from direct mail solicitation and that without it he would not be able to earn a living practicing law. Rusk is but one example of an individual who could not practice law without direct mail solicitation.[14]

In amending the Barratry Statute and the Uniform Traffic Act, the Texas Legislature

---

**8.** *State Sides: Lawyers Seek Crackdown,* Hous. Chron. December 19, 1993 at 2D.

**9.** Eric S. Roth, *Confronting the Solicitation of Mass Disaster Victims,* 2 Geo.J.L. Ethics, 967 (1989).

**10.** *Id.*

**11.** *Id.*

**12.** Sanders, *supra* note 7.

**13.** *See generally* Kenneth Conboy, *Trouble in Foley Square,* N.Y. Times, December 27, 1993, at A15.

**14.** It should be noted that not only individual practitioners or small firms have been criticized for allegedly engaging in over-zealousness in their pursuit of clients. A recent New York Times article stated that large law firms exhibited a "meal-ticket mentality," viewing clients as "all you-can-eat buffets" and as "feeding off their carcasses" in charging what was alleged to be exorbitant attorneys' fees. Allison Leigh Cowan, *The Business of Bankruptcy Hits Hard Times of Its Own,* N.Y. Times, January 12, 1994 at C2.

attempted for the second time to limit barratry in the State. Barratry is a pervasive problem in the legal community and in other professions. The Supreme Court has upheld the constitutionality of state laws prohibiting in-person attorney solicitation.[15] However, attempts by states to limit direct-mail solicitation and advertising have been generally thwarted by Supreme Court holdings.[16] The Supreme Court distinguished in-person solicitation by attorneys from mail solicitation and other forms of advertising by stating that the State's goal in protecting the public from "fraud, undue influence, intimidation, overreaching, and other forms of 'vexatious conduct'" were compelling interests and were directly advanced by banning in-person attorney solicitation. *Ohralik v. Ohio State Bar Assoc.*, 436 U.S. 447, 462, 98 S.Ct. 1912, 1921, 56 L.Ed.2d 444 (1978). Since the holding in *Ohralik*, the Supreme Court has consistently rejected outright restrictions on attorney advertising, including direct mail solicitation. In distinguishing in-person and direct mail solicitation, the Court stated that "[u]nlike the potential client with a badgering advocate breathing down his neck, the recipient of a letter ... can 'effectively avoid further bombardment of [his] sensibilities simply by averting [his] eyes.'" *Shapero*, 486 U.S. at 477, 108 S.Ct. at 1923 (quoting *Ohralik*, 436 U.S. at 465, n. 25, 98 S.Ct. at 1924, n. 24).

Perhaps the solution to the problems associated with barratry and the concerns of professionalism would best be addressed by entities besides the State, and, as a last resort, the federal courts. The State Bar of Texas did attempt to address some of the problems associated with barratry as it relates to attorneys by proposing amendments to the Texas Disciplinary Rules of Professional Conduct.[17] Proposed amended Rule 7.05 provided for limitations on attorney direct-mail solicitation by requiring that: (1) a lawyer could not send a written communication to a prospective client if the lawyer knew or reasonably should have known that the client could not exercise reasonable judgment in employing the lawyer; (2) the lawyer knew or reasonably should have known that the prospective client had made known a desire not to receive communications from the lawyer or communications concerning professional employment of a lawyer; (3) the communication involved coercion, duress, fraud, overreaching, intimidation, undue influence, or harassment; (4) the communication contains misleading or false communications; (5) any solicitation be clearly marked with the word "advertisement" on it; (6) that the solicitation not be made to resemble legal pleadings or other legal documents; (7) that the communication not contain a statement that the written communication has received any approval from the State Bar of Texas; (8) that the communication not be sent by registered mail or personal delivery; (9) that the communication not reveal on the envelope the nature of the legal problem; and (10) that the communication shall disclose how the lawyer obtained the information promoting the written communication.

The amendments to the Disciplinary Rules were recommended by the Board of Directors of the State Bar of Texas, approved by the Supreme Court of Texas, and submitted to a vote of the licensed members of the bar.[18] Approval by a majority of not less than fifty-one percent of the total membership of the bar was required by December 20, 1993 for the referendum to be enacted.[19] The bar received ballots from only 44.71 percent of the 57,376 lawyers licensed to

---

15. *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978).

16. *See Shapero v. Kentucky Bar Assoc.*, 486 U.S. 466, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988); *Zauderer v. Office of Disciplinary Council*, 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985); *In re Primus*, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978); *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977)

17. *See Proposed Amendments*, 56 Tex.B.J. 1039 (1993).

18. *See* Tex.Gov't Code Ann. § 81.024 (Vernon 1990).

19. *See generally* Karen Johnson, *Get Out the Vote ... Taking a Stand for the Profession*, 56 Tex.B.J. 1022 (1993).

practice law in Texas.[20] Thus, the amendments to the Texas Disciplinary Rules of Professional Conduct were not approved by the bar due to insufficient participation by its members.

The relatively low voting response by attorneys to these amendments evidences an apparent indifference among licensed attorneys. Lonny Morrison, President of the State Bar of Texas, stated, "[i]f we default in the adoption of reform rules addressing current and foreseeable problems, the Texas Legislature will act in our stead. If it does, we will have paid an enormous price for our apathy."[21] If the State Bar was authorized by its membership to effectively regulate attorney conduct, the Legislature would not be forced to continually intervene with legislation such as the statutes involved in this case.[22] The bar should and does attempt to serve as a paradigm for professionalism and high ethical standards.[23] Furthermore, public perception of the State Bar and of attorneys most probably would improve if the bar was permitted to implement tough disciplinary rules and itself administered sanctions for offending lawyers. Lynne Liberato, President of the Houston Bar Association, has stressed the importance of improving attorneys' public image:

> We must make every effort to improve the public perception of us. Not because we want to be liked. Not to enhance our image for image's sake. But because we must develop an image that matches the reality that we are problem solvers and that we are the guardians of our system of justice.... When people lose confidence in lawyers, they lose confidence in the rule of law. This loss jeopardizes the justice system and threatens to loosen the glue that holds our society together.[24]

Greater emphasis should be placed on improving the overall integrity and ethical quality of licensed attorneys as part of "the responsibility of self-governance."[25] The responsibility of instilling higher ethical standards of conduct in new attorneys might also partially lie with our nation's law schools which have the unique opportunity to emphasize to students their responsibilities as attorneys in our society.

In summation, this Court is faced with deciding the constitutionality of amendments to the Barratry Statute and the Uniform Traffic Act which restrict the commercial speech of certain classes of individuals. The Supreme Court has defined the limits within which states may regulate this area. The Statutes in question do not meet the requirements set forth by the Supreme Court.

For the foregoing reasons, the Court concludes that TEX.PENAL CODE ANN. §§ 38.-12(d)(2)(A), (B), (C), & (D) and TEX.REV.CIV. STAT.ANN. art. 6701d § 47(a), (b), (c), (f) are unconstitutional. Defendants shall be enjoined from enforcing these laws. It is therefore

ORDERED that plaintiffs' motion for preliminary and permanent injunctions are GRANTED. It is further ORDERED that TEX.PENAL CODE ANN. §§ 38.12(d)(2)(A), (B), (C), & (D) and TEX.REV.CIV.STAT.ANN. art. 6701d § 47(a), (b), (c), (f) are unconstitutional and defendants and their agents are enjoined from enforcing these statutes.

### SUPPLEMENTAL ORDER

On January 19, 1994 the Court granted plaintiffs' Motions for Preliminary and Permanent Injunctions in the above referenced cause. In that order, the Court ruled, *inter*

---

**20.** There has been some speculation by the President of the State Bar of Texas, that "major law firms" also did not support the proposed amendments to the disciplinary rules as he surmised that they believed the change would be "difficult.... to work with." Jerry Laws, *Bar's Advertising Referendum in Trouble*, Texas Lawyer December 13, 1993 at 10.

**21.** Lonny Morrison, *Apathy: 32,377 Professionalism: 24,949*, 57 TEX.B.J. 12, 12 (1994); *see also*, Orrin W. Johnson, *The 51 Percent Albatross*, Texas Lawyer, January 17, 1994 at 21.

**22.** Jim Barlow, *Lawyers' Ads Beyond Control*, HOUS CHRON. January 18, 1994 at 1C.

**23.** *See generally* Buford C. Terrell, *When a Lawyer Needs a Lawyer: Representing Respondents in Disciplinary Actions*, 29 S.TEX.L.REV. 371 (1988).

**24.** Lynne Liberato, *Small Examples, Great Truths*, 31 HOUS LAW. 6,6 (1993).

**25.** Morrison, *supra* note 21, at 12.

*alia,* that TEX.REV.CIV.STAT.ANN. art. 6701d § 47(a), (b), (c), and (f), is unconstitutional. Due to such ruling, TEX.PENAL CODE ANN. § 38.12(e), was thereby rendered unenforceable. However, for purposes of clarification, the Court hereby

ORDERS that TEX.PENAL CODE ANN. § 38.12(e) is also unconstitutional and defendants and their agents are enjoined from enforcing this section of the statute.